**SIEG COMPANY, Appellant,**

v.

**John F. KELLY and Denis M. Kelly, Appellees.**

No. 92–1392.

Supreme Court of Iowa.

Feb. 23, 1994.

---

Thomas D. Hanson and Robert B. Hanson, Hanson, Bjork & Russell, Des Moines, for appellant.

Thomas M. Zurek and Michael W. Thrall, Nyemaster, Goode, McLaughlin, Voigts, West, Hansell & O'Brien, P.C., Des Moines, for appellees.

Considered by HARRIS, P.J., and LAVORATO, NEUMAN, SNELL, and ANDREASEN, JJ.

LAVORATO, Justice.

This is an appeal from a decision of the district court in an appraisal action brought pursuant to Iowa Code section 490.1330 (1991). A holding company sued dissenting stockholders of two subsidiaries that were merged into the holding company. The holding company's suit sought a fair value determination of the dissenting shareholders' stock in the two subsidiaries immediately before the merger. In its appeal, the holding company challenges the district court's fair value determination. We affirm.

I. *Background Facts.*

Sieg Company—founded in 1869 and incorporated in 1888—is now a large distributor of automobile parts and supplies. Sieg Cedar Rapids and Sieg Sioux City were among its majority-owned subsidiaries. Sieg Cedar Rapids was located in Linn County and Sieg Sioux City was located in Woodbury County.

For several years before 1989, Sieg experienced marginal profits. Diversification into other business ventures was unprofitable and caused Sieg additional financial distress.

In 1989 Sieg hired new management. Management's assessment of Sieg's financial condition, coupled with a first-time certified audit, uncovered several severe problems threatening Sieg's existence.

Management implemented several remedial measures to stem these problems. One was to consolidate operations through mergers of local subsidiaries like Sieg Cedar Rapids and Sieg Sioux City.

On March 28, 1990, Sieg's board of directors entered into separate merger agreements with Sieg Cedar Rapids and Sieg Sioux City. Sieg notified all shareholders of both subsidiaries about this agreement and about the shareholders' rights to (1) dissent and (2) demand appraisal.

Two brothers—John F. Kelly and Denis M. Kelly—each owned 200 shares of stock in Sieg Cedar Rapids. John also owned 140 shares of stock in Sieg Sioux City.

Several weeks following the merger agreement, Sieg notified the Kellys that it would pay them $125 per share for their stock in Sieg Cedar Rapids. Sieg also notified John that it would pay him $62 per share for his stock in Sieg Sioux City. The Kellys deposited their shares and demanded payment pursuant to the merger agreement. *See* Iowa Code § 490.1323.

Sieg paid the Kellys $25,000 each for their stock in Sieg Cedar Rapids. Sieg also paid John $8680 for his stock in Sieg Sioux City.

Each brother then (1) notified Sieg what he thought his stock was worth, (2) demanded the difference between what Sieg paid him and what he claimed the stock was worth, and (3) demanded appraisal rights. *See* Iowa Code § 490.1328.

Sieg Cedar Rapids merged with Sieg on July 2, 1990. One week later Sieg Sioux City merged with Sieg. Sieg remains the surviving corporation. Because Sieg did not accede to the Kellys' demands, the completion of the merger set the stage for an appraisal proceeding.

II. *Background Proceedings.*

Sieg eventually sued the Kellys for an appraisal to determine the fair value of their stock. *See* Iowa Code § 490.1330. After the Kellys answered, the district court appointed appraisers. At the bench trial Sieg's expert testified in person; the Kellys' expert testified by way of deposition.

After the trial, the district court determined that the fair value for the Sieg Cedar Rapids stock was $258.61 per share and for the Sieg Sioux City stock, $117.95 per share. The court ordered Sieg to pay the Kellys the difference between what it originally had paid them for their stock and the court's determination. This amounted to $34,555 for John and $26,722 for Denis. The court also ordered Sieg to pay the Kellys interest on these amounts.

Sieg then filed a Rule 179(b) motion. *See* Iowa R.Civ.P. 179(b). In the motion Sieg alleged that the district court had adopted—with one exception—the valuation set by the Kellys' expert. Sieg complained that the valuation was full of factual and legal errors. Specifically, Sieg pointed out that the Kellys' expert had allegedly (1) valued the shares of the two subsidiaries as of an incorrect date, (2) double-counted the value of Sieg Cedar Rapids' investments in other companies when determining the value of Sieg Cedar Rapids' stock, and (3) adopted but misapplied the valuation method developed by Sieg's expert.

At the hearing on the Rule 179(b) motion, the parties—at the court's request—agreed as to what the fair value of the Kellys' stock would be, based on the valuation method the court used in its original ruling. Sieg, however, reserved its right to dispute the valuation method the court used.

Using the figures the parties had agreed upon, the court then reduced the fair value of the Sieg Cedar Rapids stock to $180.50 per share and the fair value of the Sieg Sioux City stock to $117.75 per share. The court overruled Sieg's Rule 179(b) motion in all other respects. The court then entered judgment of $18,905 for John and $11,100 for Denis, together with interest from the date of the petition. The judgment amounts were net figures, reflecting the difference between what Sieg had paid the Kellys and the fair value of their stock as determined by the court.

Thereafter, Sieg appealed.

III. *Scope of Review.*

Iowa Code section 490.1330 governs the court procedure for determining the value of dissenting shareholders' stock. The section gives no hint whether the action is at law or in equity. So it is not clear whether our review should be for errors at law or de novo.

A predecessor statute—Iowa Code section 496A.78 (1977)—provided that "the action shall be prosecuted as an equitable action and the practice and procedure shall conform to the practice and procedure in equity cases." This language then clearly dictated that our scope of review was de novo. *See Richardson v. Palmer Broadcasting Co.*, 353 N.W.2d 374, 378 (Iowa 1984).

Not surprisingly, the parties disagree on what our scope of review is under section 490.1330. Sieg thinks it is still de novo because the legislature did not clearly manifest its intent to change the nature of the proceedings. The Kellys, on the other hand, believe our review is at law.

We agree with the Kellys that our review is at law. Our current law on corporations— Iowa Code chapter 490, Iowa Business Corporation Act—became effective December 31, 1989. *See* 1989 Iowa Acts ch. 288. The legislature repealed chapter 496A entirely, replacing it with the new Business Corporation Act. The new act is silent on the nature of a fair value action in district court and how we review such a proceeding. We infer from this that had the legislature intended these actions to remain in equity, it would have said so.

Our conclusion is consistent with the reason one commentator gives for treating appraisal proceedings for dissenting shareholders as legal actions:

> In-court appraisal proceedings have been characterized as legal, as opposed to equitable actions, because of their historical limitation of the dissenting shareholder to the legal remedy of damages, in the amount of the value of that shareholder's stock.

12B William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 5906.10, at 378 (perm. ed. rev. vol. 1993). Our law similarly limits a dissenting shareholder's remedy to an award of monetary damages for the fair value of the shareholder's stock. *See* Iowa Code § 490.1330.

Because our review is at law, the district court's findings are binding on us if such findings are supported by substantial evidence. Iowa R.App.P. 14(f)(1).

## IV. *Fair Value.*

In an appraisal proceeding such as this, the district court's task is to determine the fair value of the dissenters' stock immediately before the merger. *See* Iowa Code §§ 490.1301(3), 490.1330(1); 490.1330(5)(a). Iowa Code section 490.1301(3) defines "fair value" as "the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable."

Sieg believes that the district court blindly adopted the opinion of the Kellys' expert regarding the fair value of the Kellys' stock. Sieg thinks the court's determination of such value is not supported by substantial evidence. The Kellys on the other hand argue that substantial evidence does indeed exist for the court's fair value determination.

What we have here is the usual stand off inherent in stock valuation cases. Both parties believe their expert's stock valuation calculations are the "correct" ones.

We have consistently held that, in our review of such cases, we do not look for a predominant, perfect formula for arriving at fair value. No one factor governs the determination of fair value. *See Woodward v. Quigley*, 257 Iowa 1077, 1103, 133 N.W.2d 38, 53 (1965) ("[w]e recognize [real value] cannot be determined by any exact mathematical computation and no one formula or figure is binding or conclusive"); *Robbins v. Beatty*, 246 Iowa 80, 91, 67 N.W.2d 12, 18 (1954) ("It is unwise to attempt to state every factor that may bear on value of stock in a particular case.").

However, we have recognized three popular approaches to appraisal of dissenters' stock: market value, investment value, and net asset value. *Richardson*, 353 N.W.2d at 378. In *Richardson* we concluded that, in relying on these approaches to determine the fair value of dissenters' stock, trial courts should consider the approaches "as relevant factors rather than essential components." *Id.* This conclusion is based on the realities facing trial courts:

Courts, unlike appraisers, are forced to decide cases based upon the evidence presented. Parties to "fair value" cases in the courts may be unable to find witnesses whose testimony will correspond to each of the recognized elements of fair value. Moreover, testimony as to a particular element may appear to the court to be so unreliable that it has no place in influencing the final result.

*Id.* (citation omitted).

■ Other factors that trial courts should consider in determining fair value of dissenters' stock include the rate of dividends paid, the security afforded that dividends will be regularly paid, the possibility that dividends will be increased or diminished, the size of the accumulated surplus applicable to the payment of dividends, the record of the corporation, its prospects for the future, the selling price of stocks of like character, the value of its assets, book values, market conditions, the reputation of the corporation, and all relevant factors that may influence the valuation. *Robbins,* 246 Iowa at 91, 67 N.W.2d at 18.

■ It goes without saying that trial courts should reject valuation techniques that are not supported by the evidence. Rather, they should look to valuation techniques that are easy to understand and provide a reliable guide to value. *Richardson,* 353 N.W.2d at 378.

A. *Deloitte & Touche study: valuing the stock of the parent company.* In February 1990 the accounting firm of Deloitte & Touche made a fair market value determination of Sieg's stock as of December 8, 1989. This was done after an exhaustive financial and economic study of Sieg. Jacob P. Roosma did the study and made the valuation on behalf of Deloitte & Touche. Roosma is a senior manager of Deloitte & Touche, a Big Six public accounting firm. Although not a certified public accountant, Roosma has an accounting background and specializes in the valuation of closely-held corporations.

Roosma's study and his fair market value determination of the Sieg stock were included in a written report to Sieg. The report is in evidence as exhibit YY. For reasons that will become apparent, Roosma used a price to book valuation technique to determine fair market value of the Sieg stock. This is a variant of the net asset valuation approach.

Roosma also valued the Sieg Sioux City and Sieg Cedar Rapids stock on behalf of Sieg for this appraisal proceeding. He used much of the raw data in exhibit YY in reaching his fair value determinations of the Kellys' stock in the two subsidiaries. So did the Kellys' expert, Steven Givens, a certified public accountant who also is involved in valuing closely held corporations. Both also used the same valuation technique as was used in exhibit YY: price to book value ratio.

For an understanding of how each expert reached his fair valuation determination of the Kellys' stock, we discuss aspects of exhibit YY (hereinafter appraisal report) that are pertinent to Sieg Cedar Rapids and Sieg Sioux City. Such a description will also aid in our analysis of the district court's determination of fair value for the Kellys' stock.

In preparing the appraisal report, Roosma visited Sieg's physical facilities in Davenport, Sieg's home office. Roosma also talked to management about the company's products, customers, competition, problems, opportunities, and such other aspects of the business he considered pertinent. Management supplied him with records, statistics, and financial statements. Roosma then obtained data about publicly held companies engaged in similar lines of business as Sieg.

The appraisal report defines fair market value as that value which a willing buyer and willing seller, both well informed as to the facts, but neither under any compulsion to act, would establish in an arms length sale of the asset in question. The appraisal report points out that value is always determined as of a specific date and is based upon all pertinent facts and conditions which were either known or reasonably anticipated on that date.

Because Sieg is a closely held corporation, the appraisal report emphasizes that the determination of the fair market value of such a corporation's securities presents a complex and difficult problem. The appraisal report explains that consideration has to be given to

evidence of earning power, cash flow, dividend paying capacity, book value, the financial and competitive position of the business being valued, and prices realized in the actual sales of similar property on the valuation date. The appraisal report also explains that the securities of a closely owned business lack a ready market, a factor that has a negative effect on value.

The appraisal report points out that the value of closely held securities depends on both external and internal factors. The external factors are, of course, beyond the control of management. For these reasons, a determination of fair market value of closely held securities depends on such factors as general economic conditions, conditions within the industry in which the company operates, the investing public's attitude towards securities of companies within the particular industry, the history and characteristics of the company to be valued including financial position, book value, earning power, cash flow, and the company's future prospects.

The appraisal report gives a detailed description of Sieg's business from 1869 to present. It lists approximately a dozen subsidiaries, two of which are Sieg Cedar Rapids and Sieg Sioux City. In addition, the appraisal report mentions two wholly owned subsidiaries that play some part in the valuation of Sieg's stock: Fresh Pak Candy Company and Chicago Deli Company.

The appraisal report describes Sieg as a wholesale distributor of auto parts with a chain of separately incorporated subsidiary warehouse distributors and auto parts jobber stores. Types of customers are described. The report notes that—with few exceptions—the company's inventory includes only nationally known and accepted premium name brands. The report lists eleven types of auto parts—from rebuilt starters and alternators to spray chemicals—carried by Sieg.

The appraisal report notes that Sieg is overstocked and that its inventory turnover is decidedly below industry averages. The report emphasizes that Sieg has no effective way to control its investment in inventory because it lacks computerized inventory tracking capabilities. The report also re-veals that Sieg does not take full advantage of its consolidated purchasing power.

The appraisal report goes into detail on the numbers of employees for all the entities, their rates of pay, and store hours.

Nine competitors are listed in the appraisal report. They range from local independent shops to companies that are either franchised or affiliated with major regional or national businesses.

Normally—the appraisal report points out—financial results for the past five years are important in determining the value of a nonpublic company like Sieg. Except for the first time audit for the year ended March 31, 1989, reliable financials for this period of time were not available. So Roosma reports he could give that data no consideration in the valuation process.

The appraisal report describes just how leveraged Sieg is. For example, as of March 31, 1989, Sieg had total assets of $38,441,000. Total stockholder equity financed 28.7% of Sieg's assets while total indebtedness financed about 58%. The remaining 13.3% represents the minority interests in consolidated subsidiaries of Sieg. (Leverage means using a smaller investment to generate a larger rate of return through borrowing. Black's Law Dictionary 906 (6th Ed.1990)).

The largest asset—according to the appraisal report—is inventory which at March 31, 1989, was valued at $14,614,000. The inventory is reported on a last-in-first-out (LIFO) method. This is about $9,892,000 below replacement cost. On a first-in-first-out (FIFO) basis, the inventory would have amounted to $24,506,000. (LIFO is a method of accounting that identifies and values inventories on the assumption that the last goods purchased are the first ones sold. So the goods left in the inventory at the end of the year are assumed to be those first purchased. Black's Law Dictionary 883 (6th ed. 1990). FIFO is a method of accounting that identifies and values inventories on the assumption that goods are sold in the order in which they are purchased, i.e., the oldest items are sold first. So the goods left in the inventory at the end of the year are assumed to be those last purchased. *Id.* at 627. In

times of inflation, the LIFO method results in a lower net income figure and lower inventory valuation than the FIFO method. *Id.* at 883.)

Two other major assets in the March 31, 1989, balance sheet include real estate held for sale and assets of discontinued operations held for sale. This last item includes assets of the Fresh Pak Candy Company which went out of business in 1988. The report notes that disposition of the real estate assets and the ability to reduce debt service on such assets would figure heavily in valuing Sieg's stock.

The consolidated income statement for the fiscal year ended March 31, 1989, is reviewed in the appraisal report. The statement reveals that inventory turned over 1.08 times which represented about a year's sales. According to the report, the 1.08 figure is decidedly below industry norms. The report indicates that Sieg's below average inventory turnover rate would affect its stock value.

The consolidated income statement also reveals that the business had a net loss for the year ended March 31, 1989, in excess of $6,000,000. The report notes that cash outflows associated with debt service and other cash needs took almost all of Sieg's available cash flow.

Following all of this information, the appraisal report focuses on the valuation technique to be used in valuing the Sieg stock. Not surprisingly, the report lists earnings as crucial to value because earnings enable a company to finance growth and pay dividends. That being the case, the most widely used valuation technique is the price-earnings ratio method. This technique values a company by translating earnings into value. But this technique is limited to companies with an earning history which Sieg did not have. For this reason, the report concludes that another valuation technique must be used. The technique Roosma chose was the price to book value ratio. Book value is simply assets minus liabilities.

According to the appraisal report, in using this technique the appraiser selects companies engaged in activities as similar as possible to those of the company to be appraised from an operating and investment point of view. This approach limits the extent to which the appraiser must exercise subjective judgment.

The appraisal report sets out two important criteria for the application of the price to book value ratio technique. First, the comparable companies must make their financial statements available to the public. Second, the common stock of such companies must be publicly held and actively traded.

The appraisal report notes that Roosma gave consideration to twenty-seven companies as possible comparables. He chose four of these companies to use as comparables: Action Auto Stores, Inc.; The Pep Boys—Manny, Moe & Jack; Republic Automotive Parts, Inc.; and Trac Auto Corp. Several adjustments were made to the financial data of these four companies. First, items of an unusual or nonrecurring nature were eliminated from the income accounts. Second, intangibles were eliminated from the balance sheets of these companies. Last, to provide consistency in inventory costing policies, inventories of all these companies were restated to a FIFO inventory costing method. According to the report, these adjustments provided Roosma with the historical, normalized, ongoing earning power of each business and with balance sheets reflecting inventory costing policies paralleling those of Sieg.

The appraisal report observes that price to book value ratios are related to the rate of return on equity. That means the lower the company's return on equity, the lower the price to book value ratio. Historically, there is a direct relationship between profitability as measured by return on equity and the price to book value ratio. In general, market value ratios are affected positively by persistent historical growth and profitability.

Comparing Sieg to the four comparable companies, the appraisal report describes Sieg as small and ranks it among the lower companies in terms of current profitability. Based on the study of Sieg's business, the report concludes that Sieg's growth has not been great in recent years. For these reasons the report concludes that Sieg's stock would trade at the lower end of the range of the four comparable companies used.

In applying the price to book value ratio, the report notes that Roosma chose the comparable company having the lowest price to book value ratio—Republic Automotive Parts, Inc. Republic traded at 66.7% of book value. The other comparables—Trak Auto Corp., Action Auto Stores, Inc., and The Pep Boys—Manny, Moe & Jack—traded at 89.-7%, 92.4%, and 214.7% of book value. Republic—the comparable chosen—earned $898,000 in the most recent year on a book value of $23,623,000 for a return on equity of 3.8%. The report concludes that if the common stock of Sieg were like Republic in all other respects, it would trade at a price to book value ratio not in excess of 66.7%.

Starting with the 66.7% ratio, the appraisal report adjusts downward for several factors. The report notes that a willing buyer of Sieg's stock would consider the low inventory turnover ratio and would be concerned as to whether the carrying value was realizable, and if realizable, when it was realizable. The report emphasizes that management does not have the information to make an informed judgment on that question.

A second factor a willing buyer would be concerned about—the appraisal report notes—is the $10 million investment in real estate. The debt service and costs on this investment hamper management's ability to invest in the company's core business. The report points out that management contemplates no immediate sale so that the debt service and costs could continue indefinitely.

The appraisal report concludes that these two factors—low inventory turnover and the real estate investment—reduce the 66.7% price to book value ratio to between 50% and 60%. In short, the Sieg stock would sell from between 50% and 60% of book value.

The appraisal report then adjusts Sieg's book value for the after tax difference between LIFO and FIFO inventories. That adjustment increases Sieg's book value to $16,958,000. The 50% price to book value ratio (50% × $16,958,000) produces a value of $8,479,000 or $59.16 for each of the 143,330 shares outstanding. The 60% price to book value ratio (60% × $16,958,000) produces a value of $10,175,000 or $71 per share. At this point the report states a preliminary value of $65 per share. This simply means that if Sieg stock were actively traded, it would sell for $65 per share. The $65 per share figure is the midpoint between the $59.16 and $71 values. The $65 per share figure also represents a price to book value ratio of 55% on a FIFO inventory basis.

The appraisal report, however, points out that one last adjustment has to be made. Sieg stock—unlike the comparables—has no organized market. That is, Sieg stock lacks ready marketability, an element of value ordinarily of significant importance to investors in common stock. Because Sieg's stock lacks ready marketability, the report concludes that the stock must trade at a price less than that of an otherwise equal security which is readily marketable. This discount is the incentive to purchase Sieg's stock rather than a comparable stock that is readily marketable.

The report refers to a study that Roosma made of restricted common stock relative to their freely traded counterparts. The study was made to quantify the amount of discount for lack of ready marketability. The study indicated a discount of between 30% and 35%. The report concludes that Sieg's stock has a fair market value of $42.25 per share. This value is reached by applying the 35% discount to the preliminary value of $65 per share. The $42.25 per share figure represents a price to book value ratio of about 35% on a FIFO inventory basis.

B. *Methodologies used by the experts to value the stock of the two subsidiaries.* As we said earlier, both experts—Roosma and Givens—used the raw data in the appraisal report, exhibit YY, to determine fair value of the stock in the two subsidiaries, Sieg Cedar Rapids and Sieg Sioux City. There was no material change in this data from the date of the appraisal report and the valuation date for the stock of the two subsidiaries. Both experts used the same methodology in reaching fair value: price to book value ratio. Both used the same comparables that were used in the appraisal report. However, their conclusions as to fair value for the stock of the two subsidiaries are materially different. The difference arises in how each used the raw data. The difference is the result of two

factors: the treatment of inventories and the determination of the price to book value ratios.

■ 1. *Treatment of inventories.* Roosma did not restate the inventory for either subsidiary to a FIFO basis. The inventories remained on a LIFO basis.

In contrast, Givens did restate the inventories to a FIFO—replacement cost—basis after a tax effect adjustment. This resulted in an increase of $491,388 to book value for Sieg Cedar Rapids and an increase of $249,575 to book value for Sieg Sioux City.

The district court was convinced that Givens' treatment was the better approach and that was the approach the district court ultimately used. Givens explained why he restated the inventories to a FIFO basis:

The inventory as it was recorded on [the books of the two subsidiaries] was recorded under a method of valuation primarily used for tax purposes. It's referred to as LIFO. It's referred to as last-in-first-out. It's a method that companies use to take [inflation] out of inventory and accordingly the value is understated within the books.

Coming back to your question, I started with a net book value of the company. To that then I made some adjustments, similar adjustments to what Deloitte had done, and it was basically to add back what is known as a LIFO reserve to bring that up to a comparable number with these publicly traded companies.

For consistency, then, Givens followed the same procedure for restating the inventories of the two subsidiaries that Roosma had followed in valuing the Sieg stock. Roosma had restated Sieg's inventory and the inventories of the four comparable companies from LIFO to FIFO to put them on the same footing. This adjustment resulted in a substantial increase in Sieg's book value.

Roosma deviated from his own procedure when he made no such adjustment to the inventories of the two subsidiaries despite the fact that both had inventory turnover ratios close to Sieg's. Roosma deviated—he testified—because management told him that half of the inventories owned by the two subsidiaries was not merchantable.

The district court did not accept this reason, expressly finding that Givens' appraisal methodology was the more "credible and applicable." Roosma had no better verified information about the inventories of the two subsidiaries and Sieg than when he stepped up Sieg's inventory to a FIFO basis in the appraisal report, exhibit YY. Yet he made no similar adjustment to the inventory figures of the two subsidiaries. Such an adjustment would, of course, have increased substantially the book value of the two subsidiaries. Our review of the record leads us to conclude that there was substantial evidence to support the district court's assessment that Givens' approach was more credible.

■ 2. *Price to book value ratios.* The most significant difference between the two experts results from the price to book value ratios each used. Roosma valued Sieg Sioux City stock at 60% of book value and Sieg Cedar Rapids stock at 63% of book value. Givens on the other hand valued each subsidiary's stock at 82.93% of book value. The valuations reached by both experts were on a going concern rather than on a liquidation basis.

a. *Sieg's expert: his reasons for his price to book value ratios.* Roosma gave several reasons why he used the 60% and 63% price to book value ratios for the stock of the two subsidiaries. First, Sieg Sioux City showed losses from auto parts operations in three of the five most recent years. Although Sieg Cedar Rapids did have earnings, they were modest and on the decline. In contrast, all of the comparables were experiencing profits from their operations. A lack of substantial earning capacity caused Roosma to value both subsidiaries below their book values in comparison to the comparables he used. In looking at the comparables, Roosma determined that their earnings history demonstrated that the more a company earns with a dollar of book value, the more the book value is worth in terms of market value.

Second, the two subsidiaries were—in Roosma's opinion—"decidedly less attractive" than the comparable companies.

Last, the inventory turnover ratios for both subsidiaries—1.10 for Sieg Sioux City

and 1.04 for Sieg Cedar Rapids—were below the 3.74 ratio for the average company in the industry. In other words, the two subsidiaries had about four times more inventory than the average company in the industry. This suggested to Roosma that the two subsidiaries had much inventory that did not move. In addition, Roosma testified that management had told him that half of the inventory belonging to the two subsidiaries was not merchantable. In Roosma's opinion, this less-than-glowing picture about the subsidiaries' inventories detracted further from their book values.

b. *The Kellys' expert: his reasons for his price to book value ratios.* In arriving at his book value ratio, Givens looked at the ratios for the four comparable companies in the appraisal report, exhibit YY. These ratios again were 66.7%, 89.7%, 92.4% and 214.7%. Givens disregarded the 214.7% ratio because he felt there was not enough information for him to conclude it was comparable. He then averaged the sum of the other three ratios. This produced a figure of roughly 82%. This compared to about a 55% ratio that Roosma used for Sieg in the appraisal report. (The 55% figure is before any discount for lack of ready marketability. Roosma did not apply a similar discount in the case of the two subsidiaries. Presumably, this is in recognition of the fact that caselaw prohibits applying a discount because of the stockholder's status as a minority shareholder. For comparison purposes, then, the appropriate price to book value ratios as far as Roosma's approach is concerned are 55% for Sieg, 60% for Sieg Sioux City, and 63% for Sieg Cedar Rapids.)

According to Givens, he chose to use the 82% rather than the 55% ratio used for Sieg because Sieg was much more leveraged than the two subsidiaries. The significance of this leverage difference becomes apparent on cross-examination of Roosma:

Q. If you had to compare the debt, the percentage of total debt to total assets for the three companies, Sieg Co., Sieg Sioux City, and Sieg Cedar Rapids, could you do that? A. Sure. In the case of Sioux City, total debt to total assets is 25 percent. In the case of Cedar Rapids, total debt to total assets is 15 percent. In the case of Sieg Company, I believe it's in the neighborhood of 72 [percent].

. . . .

Q. Doesn't it appear that from a total assets to total liabilities—from that standpoint that Cedar Rapids and Sioux City are much stronger companies than Sieg Co.? A. Well, from a financial point of view in terms of leverage if you look at the numbers, yeah, you would make that conclusion.

. . . .

Q. And what was the price to book value ratio that you used for Sieg Co.? A. . . . 55% of LIFO book.

Q. Now, what was the price to book value ratio that you used for Sioux City? A. For Sioux City . . . 60 percent.

Q. 60 percent, and what was your price to book value ratio that you used for Cedar Rapids? A. 63 percent.

Q. . . . [W]ould it be fair to say that Sioux City had . . . three items of asset to one item of liability? You got a 25 percent ratio, right? A. Yeah.

Q. And with regard to Cedar Rapids, you only had a 15 percent ratio, correct? A. Correct.

Q. . . . [A]nd in Sieg Co., 72 percent ratio, correct? A. Correct.

Q. And yet what you did was you came to a conclusion that the price to book value ratio for these companies would be within 8 percent of each other? A. Yes.

. . . .

Q. Isn't it a fact that Sieg Sioux City and Sieg Cedar Rapids had a far better financial condition for each company than did Sieg Co.? A. Yes.

Q. Yet you found that the price to book value ratio is essentially the same? A. Correct.

Givens testified that this leverage factor accounted for a part of the discount to the book value ratio that Roosma used to value Sieg's stock. For that reason, Givens believed a substantially higher price to book value ratio should have been used for the two

subsidiaries. On this point, Givens testified this way:

> In my own opinion I have used different methods of discounting than they had [with Sieg] because the discounting they have used [with Sieg] is inappropriate for these [two subsidiaries], discounting based upon a high degree of leverage for [Sieg] ... [so] I did not use as severe a discounted process [for the two subsidiaries].

The district court found that Givens' analysis was more convincing and adopted the 82% price to book value ratio for valuing the stock of the two subsidiaries. Although the 82% figure was an average, the figure was within the range of comparables used. The evidence therefore supports the 82% figure the district court adopted. Given the leverage difference between Sieg and the two subsidiaries, we can certainly understand why the district court did not believe that the price to book value ratio for the two subsidiaries should approximate that of Sieg's.

In the appraisal report, Roosma attributes a substantial part of the discount in the price to book value ratio for Sieg to its leverage factor. At one point in the report, Roosma says:

> The disposition of the real estate assets held by the firm, a considerable investment, and the ability to reduce debt service are a *material* concern to the hypothetical investor in the common stock of Sieg Company.

(Emphasis added.) At another point in the report, Roosma attributes this continuing debt service as one of the reasons for discounting Sieg's stock down to between 50% and 60% of its book value. The two subsidiaries, on the other hand, were not saddled with similar investments and debt service. Their cash flows were not similarly exhausted.

The district court's ruling leads us to conclude the court felt that the two subsidiaries were in far better shape financially than Sieg. And for that reason the court believed their stock should have been valued much higher than Sieg's. After reviewing the record, we conclude there is certainly substantial evidence to support this conclusion.

In addition, the evidence reveals that Sieg's new management at one time had some notion that book value with no discount should be the proper value for the stock of the two subsidiaries. For example, in 1989, management obtained some of that stock on a book value basis.

## V. *Disposition.*

The district court's methodology in valuing the stock of the dissenting shareholders immediately before the merger included the following steps. First, the book value of each subsidiary was determined. Second, the book value of each subsidiary was adjusted to reflect the after tax difference between LIFO and FIFO inventories. Third, an 82% price to book value ratio was applied to the adjusted book value of each subsidiary. Last, in the case of each subsidiary, the resulting figure was divided by the number of outstanding shares immediately before the merger. That resulted in a fair value of $180.50 per share for Sieg Cedar Rapids stock and $117.75 per share for Sieg Sioux City stock. There was substantial evidence to support the court's methodology and conclusion.

Finding no error, we affirm.

**AFFIRMED.**