**SECURITY STATE BANK, HARTLEY, IOWA, Appellant,**

v.

**Genevieve H. McDowell ZIEGELDORF, Appellee.**

**SECURITY STATE BANK, LAKE PARK, IOWA, Appellant,**

v.

**Allen ARNOLD and Genevieve H. McDowell Ziegeldorf, Appellees.**

No. 95–774.

Supreme Court of Iowa.

Oct. 23, 1996.

Arthur F. Owens and James W. O'Brien of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for appellants.

Michael Zenor of Zenor & Carr, Spencer, for appellee Arnold.

Peter B. Narey of Narey, Chozen & Saunders, Spirit Lake, and Harold W. White of Fitzgibbons Brothers, Estherville, for appellee Ziegeldorf.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, TERNUS, and SCHULTZ,* JJ.

TERNUS, Justice.

After the shareholders of appellants, Security State Bank, Hartley and Security State Bank, Lake Park, approved a reverse stock split, the banks brought these actions to determine the value of shares held by the dissenting shareholders, appellees, Genevieve Ziegeldorf and Allen Arnold. All parties appeal from the trial court's appraisal of the shares. In addition, the dissenting shareholders appeal from the court's refusal to award attorney fees. We affirm the value placed on the shares by the trial court, reverse the court's denial of attorney fees, and remand for a determination of the reasonable attorney fees and expenses incurred by the dissenting shareholders.

## I. Background Facts and Proceedings.

Security State Bank, Hartley, and Security State Bank, Lake Park, are closely-held Iowa banks. *See* Iowa Code ch. 524 (1993). First Security Banshares, Inc., a bank holding company, owns the majority of stock in both banks. The holding company is owned primarily by M.J. Kuehl, who also serves as chairman of the board of directors for each bank. Genevieve Ziegeldorf is a minority shareholder in Hartley and Lake Park; Allen Arnold is a minority shareholder in Lake Park.

In May 1993, Hawkeye Bancorporation, a multibank holding company, expressed an interest in acquiring both banks for 1.25 times their book value. First Security Banshares was not interested in selling. Consequently, it moved to consolidate its control over the banks by initiating a reverse stock split. Under the reverse stock split plan, the number of Lake Park shares would be reduced from 2100 to five; the number of Hartley shares would shrink from 2000 to thirty. The amended articles of incorporation implementing these changes provided that no fractional shares would be issued; instead any fractional shares created would be acquired for cash. *See* Iowa Code § 490.604. The effect of this

plan was to squeeze out the minority shareholders. Pursuant to Iowa Code section 490.1302, the minority shareholders had a right to dissent from this action and obtain payment of the "fair value" of their pre-split shares.

In November 1993, the reverse stock split was approved by a majority vote of the shareholders; the banks then requested formal approval of the plan from the Iowa Superintendent of Banking. *See* Iowa Admin. Code r. 187–2.7(3) (1993). The applications submitted to the banking superintendent included the banks' proposal to pay any dissenting shareholders book value for their shares. The superintendent approved the banks' plan in December 1993, finding the amounts to be paid for the dissenting shares "reasonable." *See id.* r. 187–2.7(3)(c).

Ziegeldorf and Arnold dissented from the reverse stock split and took the required steps to obtain payment of the fair value of their shares. *See* Iowa Code §§ 490.1321–.1328. When the reverse stock split became effective in December 1993, the banks paid Ziegeldorf $1,931.04 per share of Hartley stock and Ziegeldorf and Arnold $1,355.60 per share of Lake Park stock. *See id.* § 490.1325 (requiring corporation to pay each dissenter the corporation's estimate of fair value). These figures were equal to the book value of the shares as of the effective date of the reverse stock split.

Dissatisfied with receiving only book value for their shares, Ziegeldorf and Arnold exercised their rights as dissenting shareholders and demanded payment of their estimate of fair value. *See id.* § 490.1328(1)(a) (if dissenter believes corporation's payment is less than fair value, dissenter must demand payment of dissenter's estimate of fair value). In lieu of paying these demands, each bank filed a petition for determination of fair value of dissenter's shares. *See id.* § 490.1330 (if the corporation fails to pay the dissenter's demand for payment, the corporation must petition the court to determine the fair value of the shares). These actions were consolidated for trial.

* Senior Judge assigned by order pursuant to Iowa Code section 602.9206 (1995).

The banks introduced the testimony of one expert witness, Thomas Mecredy. Ziegeldorf and Arnold called two experts, Dennis Bixenman and Paul Stave. Their opinions of the per-share fair values of the stock in the Lake Park and Hartley banks are set out in the following table:

| | LAKE PARK | HARTLEY |
|---|---|---|
| Mecredy | $1,225 | $1,350 |
| Bixenman | $2,466 | $3,081 |
| Stave | $1,958 | $2,851 |

The district court found the fair value of the Lake Park stock to be $2,120 per share and the fair value of the Hartley stock to be $2,526 per share. (These figures represented a per-share difference from the book value paid by the banks of $764.40 for the Lake Park shares and $594.96 for the Hartley shares.) The court entered judgment against the banks for the sum by which the court-appraised values exceeded the payments previously made by the banks to Ziegeldorf and Arnold. The trial court denied the dissenters' request for an award of attorney fees and expert expenses. *See id.* § 490.1331(2) (allowing assessment of fees and expenses of counsel and experts under specified circumstances).

The banks appeal, alleging two bases for reversal: (1) the trial court improperly refused to discount the value of the shares due to their lack of marketability as shares of closely-held corporations; and (2) the trial court failed to give any weight to the banking superintendent's finding that the banks' initial offer of book value to the dissenting shareholders was "reasonable." Ziegeldorf and Arnold cross-appeal, raising two issues: (1) the trial court should have adopted the fair values to which their expert, Dennis Bixenman, testified; and (2) the trial court erred in its refusal to award attorney and expert witness fees. We will review additional pertinent facts in our discussion of each issue.

## II. *Scope of Review on Valuation Issues.*

■ Actions to determine the value of dissenters' shares pursuant to section 490.1330 are at law. *Sieg Co. v. Kelly,* 512 N.W.2d 275, 278 (Iowa 1994). Consequently, our review would typically be for errors of law. *See id.* Notwithstanding the legal nature of a fair value action, the present case was tried in equity.[1] We have said we will review a case on appeal in the same manner as it was tried in the district court. *Davis–Eisenhart Mktg. Co. v. Baysden,* 539 N.W.2d 140, 142 (Iowa 1995). Therefore, our review is de novo. *Id.* Nevertheless, we give considerable deference to the trial court's factual determinations. *Id.*

## III. *Fair Value Determination.*

Iowa Code chapter 490 allows a shareholder to dissent from a corporate action that "[r]educes the number of shares owned by the shareholder to a fraction of a share if the fractional share so created is to be acquired for cash." Iowa Code § 490.1302(1)(d)(5). If the dissenter and the corporation cannot agree on the fair value of the dissenter's shares, the corporation must commence an action to determine the fair value. *Id.* § 490.1330(1).

■ Given the statutory nature of this action, the starting point in determining fair value is the definition of that term provided in chapter 490:

> *"Fair value"*, with respect to a dissenter's shares, means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable.

*Id.* § 490.1301(4). We have consistently said there is no predominant, perfect formula for arriving at fair value. *Sieg,* 512 N.W.2d at 278. Similarly, no one factor dominates the determination of fair value. *Id.* Nevertheless, in interpreting this statute and its predecessors, we have recognized three standard approaches to stock valuation: (1) market value of the stock; (2) net asset value of the corporation; and (3) in-

---

1. We point out, however, that the trial court is not required to try a fair value action in equity simply because the parties stipulate to do so. The trial court is free to insist that the case be tried as the law action it actually is. *See Davis–Eisenhart Mktg. Co. v. Baysden,* 539 N.W.2d 140, 142 (Iowa 1995) (litigants cannot bind the court with stipulations as to the law).

vestment value. *Id.; Woodward v. Quigley*, 257 Iowa 1077, 1081, 133 N.W.2d 38, 40 (1965). Within the framework of these methods of valuation are innumerable factors that bear on the value of the stock. *See Davis–Eisenhart*, 539 N.W.2d at 142; *Sieg*, 512 N.W.2d at 278. The most useful methods of valuation and the most relevant factors vary, depending upon the circumstances of each case. 12B Charles R.P. Keating & Jim Perkowitz–Solheim, *Fletcher Cyclopedia of the Law of Private Corporations* § 5906.120, at 433 (perm. ed. rev.vol. 1993) [hereinafter *Fletcher* ].

The first issue in this case concerns one such factor—the marketability of the stock. We address this issue next.

## IV. *Marketability Discount.*

■ The banks object to the court's valuations because the court's appraisal did not incorporate a discount for the stocks' lack of marketability. They argue stock in closely-held corporations lack a ready market. Consequently, the value of such shares, the banks contend, is less than what might otherwise be calculated without consideration of this factor.

■ Before we address the propriety of a marketability discount, it is helpful to have in mind the purpose of chapter 490 dissenter rights. This statute was enacted to allow majority shareholders to exercise their voting rights to control the corporation yet at the same time allow a dissenting minority shareholder to get out of the corporation with a fair value for his or her stock. *Woodward*, 257 Iowa at 1086, 133 N.W.2d at 43 (referring to "real value," the phrase used in the predecessor statute to chapter 490). "It prevent[s] the minority from being squeezed out for a lesser price." *Id.* To effectuate this goal, we have refused to allow the value of the dissenter's shares to be discounted because they represent a minority interest in the corporation. *Id.* at 1087, 133 N.W.2d at

43. Such a discount "in effect would let the majority force the minority out without paying it its fair share of the value of the corporation." *Id.*

The discount which the banks complain the trial court overlooked here is not the minority discount we have previously rejected. *See Fletcher* § 5906.120, at 436 ("lack of marketability discount is separate from, and bears no relation to, a minority discount"). Rather, the banks assert on appeal the value of *all* stock in the bank, whether representing a majority interest or a minority interest, suffers because the bank's stock is not publicly traded. As a result, they contend, there is no ready market for *any* shares in the banks. The banks argue this lack of marketability or lack of liquidity decreases the value of the banks' stock, justifying a discount to the value the stock would otherwise have.

The problem with the banks' position is that the evidence in the record showed a lack-of-marketability discount was applicable here *only* because the stock being valued was a minority interest.[2] Mecredy, the banks' expert witness, testified that theoretically a block of publicly-traded stock has instant liquidity and therefore, is more valuable than a closely-held stock which lacks such liquidity. On the other hand, he also testified that in this case, had he been asked to value a controlling block of stock rather than a minority block, he would not "look at marketability and liquidity." In other words, he applied a marketability discount here only because the stock represented a minority interest.

Bixenman testified he did not apply a marketability discount in determining the value of the bank stock. He also testified that one would typically not apply a marketability discount if a controlling interest were being sold, even if the stock was not publicly traded. Stave testified the marketability of stock varies and even a controlling position may be subject to a marketability discount. He suggested, however, there are factors affecting

---

**2.** Because there is no record support for applying a lack-of-marketability discount in this case, we need not consider whether such a discount would always be inappropriate as suggested by the dissenters. They argue the action of the corporation in initiating the reverse stock split and thereby triggering dissenters' rights created a market for the stock. Under this reasoning, they contend, there should be no discount because a ready market in fact exists. We express no opinion on this issue.

marketability in addition to whether the corporation is closely-held, such as the nature of the business being sold. He did not apply a marketability discount in his valuation of the bank stock involved here.

Based on this record, a marketability discount would have been improper under Iowa law. Mecredy and Bixenman testified such a discount is *only* applied to minority blocks of stock. It is just this type of factor, *one only applicable to minority shares,* that cannot be considered under chapter 490. To allow a marketability discount under this record would undermine the legislature's intent to protect minority shareholders from being forced out at a price below the fair value of their pro-rata share of the corporation. Therefore, we conclude the trial court did not err in rejecting a marketability discount in this case.

## V. *Banking Superintendent's Approval of Book–Value Payment.*

■ We address one additional issue before we turn to the parties' challenges to the trial court's appraisal of the dissenters' stock. The banks criticize the trial court's refusal to give any weight to the banking superintendent's approval of the banks' proposal to pay the dissenters the book value of their shares. The trial court had two reasons for ignoring the superintendent's decision: (1) the superintendent was given limited documentation from the banks prior to his review and approval; and (2) the superintendent was required to satisfy himself that the payment was "reasonable," not that it represented the "fair value" of the stock.

Under Iowa law, the banking superintendent must review and approve the proposed reverse stock split before the majority can effect its action. Iowa Code § 524.106; Iowa Admin. Code r. 187–2.7. The Code requires the superintendent to review the proposed action to make certain it will not prejudice the interests of the depositors. *See* Iowa Code § 524.1505(1). Consequently, the superintendent's purpose is to ensure the corporation does not pay *too much* for the dissenter's shares, not too little. In addition, the standard factors to be considered in the reasonableness determination are consider-

ably fewer than in the standard appraisal action. *Compare* Iowa Admin. Code r. 187–2.7(3)(c) *with Sieg,* 512 N.W.2d at 279. More importantly, the superintendent's regulations allow him to consider "the total number of shares to be surrendered" in evaluating the reasonableness of the proposed payment. Iowa Admin. Code r. 187–2.7(3)(c)(5). As noted above, this factor cannot be considered in a fair value determination.

Under chapter 490, the district court's jurisdiction to determine fair value is plenary and exclusive. Iowa Code § 490.1330(4). The appraisal action bears little relationship to the administrative action that precedes it; the appraisal action is not a review of the agency determination of reasonableness.

We agree with the trial court that the banking superintendent's determination that the proposed price to be paid to dissenting shareholders is reasonable is irrelevant to a determination of fair value. *See* Iowa R. Evid. 401. Whether a price is reasonable from the perspective of the depositors of an institution is not the same as whether the price represents a fair value which will protect the interests of the dissenting shareholders. Not only do the focuses of the superintendent and the court differ, the factors they consider and the amount of information presented to them differ as well. Therefore, the trial court correctly gave the superintendent's approval of the price no weight in its appraisal of fair value.

## VI. *Calculation of Fair Value.*

Having addressed the parties' disagreements with respect to the proper factors to be considered in making a determination of fair value, we now turn to their criticism of the trial court's bottom line.

■ A. *Mecredy's valuation.* The banks contend Mecredy's figures should have been adopted by the court as the fair value of the dissenters' shares. Mecredy's valuations, however, were fundamentally flawed because he clearly valued these shares on the basis of their minority status. Adjustments based on the minority status of the stock are not allowed under Iowa law. *Woodward,* 257 Iowa at 1087, 133 N.W.2d at 43. For this reason,

we, like the district court, cannot accept Mecredy's opinions of the fair values of the banks' stock.

B. *Valuation figures used by experts.* The dissenters urge us to adopt the valuations of their expert, Dennis Bixenman. Before we examine his valuations, however, it is helpful first to review the calculations underlying the experts' opinions of fair value. All three experts prepared valuation reports showing per-share values for the stock of each bank. Each expert computed a per-share figure using book value or net asset value, adjusted book value, market value (except Bixenman), adjusted earnings value, net present value of future earnings, and dividend value. Based on each expert's view of the accuracy of these valuations, he arrived at an opinion of "fair value."

■ C. *Market value.* The court found the market values calculated by Mecredy and Stave of little help. Prior to the reverse stock split, there had been no recent sales of Hartley stock and only one of Lake Park stock: a sale of ten shares for $933 per share. This price was considerably below the values calculated for this stock under any other method or considering any other factor. Moreover, Mecredy acknowledged in his appraisal report that the sale of ten shares was an inadequate basis upon which to arrive at a market value. For that reason, he considered the market value method immaterial to his valuation of the stock.

The only other evidence arguably showing market value was Hawkeye Bancorporation's indication of its interest in purchasing the banks for 1.25 times book value. But this overture was certainly not a sale nor even a firm offer; it was merely an expression of interest that would hopefully start the negotiating process. Consequently, although Hawkeye's invitation might indicate one person's preliminary view of the value of the stock, it certainly was not the product of bargaining between a willing buyer and a willing seller. *See Sieg,* 512 N.W.2d at 279 (adopting appraiser's report which defined "fair market value" as "that value which a willing buyer and willing seller, both well informed as to the facts, but neither under

any compulsion to act, would establish in an arms length sale of the asset in question").

We agree with the district court and Bixenman, who did not determine a market value, that there simply was insufficient information available to calculate a reliable value under a market approach. *See id.* (court should reject valuation techniques that are not supported by the evidence); *Richardson v. Palmer Broadcasting Co.,* 353 N.W.2d 374, 379 (Iowa 1984) (disregarding net asset value method because the record was inadequate to determine value using this method); *Woodward,* 257 Iowa at 1082, 133 N.W.2d at 40 (court did not consider market value because there was no evidence of any sales of the stock on the open market).

■ D. *Net asset value and adjusted net asset value.* The trial court also rejected the valuations based on net asset value and adjusted net asset value. "Net asset value is the share the stock represents in the value of the net assets of the corporation." *Fletcher* § 5906.140, at 454. To calculate "adjusted net asset value," an average price-to-equity ratio is applied to the "net asset value."

To be most accurate, net asset value should be based, not on book value, but on a current appraisal of all the corporation's property, tangible and intangible. *Id.* at 455. Where book value is used rather than a current asset appraisal, the figure obtained after applying a price-to-equity ratio is also known as the "adjusted book value."

■ As Mecredy and Bixenman pointed out, these methods of valuation in effect represent the value of the stock upon liquidation. *See id.* (net asset value "is a value based on a hypothetical dissolution and distribution of the corporate assets"). The banks, however, were going concerns and must be valued as such. *Woodward,* 257 Iowa at 1083, 133 N.W.2d at 41 ("the real value of the stock is still to be determined as in a going concern"); *Fletcher* § 5906.140, at 455.

We considered the usefulness of a net asset valuation in *Woodward.* There we indicated this value was far less important than the investment value of the stock. *Woodward,* 257 Iowa at 1083, 133 N.W.2d at 41. Nevertheless, we recognized that it offered

"protection to the minority stockholder in a corporation with a poor earnings record" where the value of the corporation as a going concern might be less than its liquidation value:

It would not be fair to limit the minority interest to a value influenced by poor earnings, when the minority might prefer to liquidate and convert the assets into cash, and at the same time place the majority in a position where it could later liquidate and receive the entire benefit of the greater liquidation value.

*Id.* Consequently, we concluded "[i]t was necessary to consider liquidation value of the assets to protect the minority from an arbitrary action by the majority." *Id.* at 1086, 133 N.W.2d at 42.

We place little reliance on the net asset value and adjusted net asset value in this case. *See Sieg,* 512 N.W.2d at 279 (court should reject valuation techniques that do not provide a reliable guide to value). The experts did not independently appraise the assets of the bank but merely used book value as the basis for net asset value, thereby lessening the accuracy of both the net asset value and the adjusted net asset value figures. In fact, Stave did not even use the term "net asset value" in his report, using "book value" and "adjusted book value" instead. He acknowledged it was not possible to use a net asset value method because the necessary information to value key assets was not available. Consequently, the experts' reliance on book value and adjusted book value reduces considerably the reliability of the net asset valuation approach.

In addition, the banks were financially healthy entities and had significant earnings in the years preceding the reverse stock split. Consequently, they had value as ongoing concerns, a value not reflected in the net asset and adjusted net asset valuations. Finally, the likelihood of future earnings makes investment value a more accurate indicator of the fair value of the dissenters' shares. Therefore, we, like the trial court and the

experts, focus our attention on the factors considered in assessing the investment value of the banks' stock.

E. *Investment value.* Investment value is the present value of the future benefits accruing to the stockholder. The experts considered the investment value of the stock by calculating values based on adjusted earnings, net present value of future returns and dividends. The adjusted earnings value is calculated by using the banks' earnings per share and applying a multiplier based on the average price-to-earnings ratio of similar banks. The net present value approach projects future income for ten years, then discounts that figure to present value. The present value of this future income is then added to the residual value of the bank at the end of that period, discounted to present value. The sum of the discounted future income and discounted residual value equals the net present value of the stock. The dividend value is calculated by projecting the amount of dividends that will be paid in the future and applying a multiplier based on the average dividend yield on comparable publicly-traded companies.

■ The trial court disregarded the dividend value because the figures varied widely between the experts and in comparison with other valuation estimates. For example, Mecredy placed a dividend value on Hartley stock of $13,559 compared to $4,036 by Bixenman and $3,230 by Stave. Moreover, the testimony showed the practice of declaring dividends in a closely-held corporation was dependent on factors that were difficult to predict. We agree with the trial court's decision to place little reliance on the dividend values.

■ That leaves us with the adjusted earnings value and the net present value of future income. These values for the Lake Park stock varied from a low of $1,947 to a high of $2,365. For the Hartley shares, they ranged from a low of $2,124 to a high of $2,881.[3] As stated above, the values placed

---

**3.** Mecredy's figures for the adjusted earnings value were the result of straightforward calculations, unaffected by any minority discount. Consequently, the court considered the adjusted

earnings values of all three experts. Mecredy's figures for net present value of future income did reflect a minority discount. Mecredy did not include the discounted residual value of the cor-

on the dissenters' shares by the trial court were \$2,120 for Lake Park and \$2,526 for Hartley. The trial court arrived at these values by giving equal weight to the adjusted earnings values and the net present values of future income computed by each expert, finding no reason to rely on one value more than another. On our de novo review, we agree with the trial court's appraisal.

F. *Bixenman's fair value opinions.* We have considered the arguments of Ziegeldorf and Arnold, urging us to adopt Bixenman's opinions on fair value; we decline to do so. Bixenman believed the Lake Park stock had a fair value of \$2,466 per share and the Hartley stock had a fair value of \$3,081 per share. He relied primarily on the dividend value in appraising the Lake Park shares and primarily on the net present value of future income and the dividend value in arriving at the fair value of the Hartley shares. (Bixenman's dividend values for the stock were higher than the values he computed under any other valuation technique.) In contrast, we have concluded the dividend value is not as reliable as the net present value of future income and adjusted earnings value. Because Bixenman relied on a valuation we have rejected, we will not adopt his opinion of the fair value of the banks' stock. Furthermore, we note the trial court, in the face of conflicting evidence, also rejected Bixenman's valuation opinions. We accord "great weight" to the trial court's judgment on this matter. *Davis–Eisenhart,* 539 N.W.2d at 142. Therefore, we affirm the trial court's appraisal of the dissenters' shares.

VII. *Attorney Fees.*

Section 490.1331 provides for the assessment of attorney fees and expert witness expenses for either of the following:

*a.* Against the corporation and in favor of any or all dissenters if the court finds the corporation did not substantially comply with the requirements of sections 490.1320 through 490.1328.

*b.* Against either the corporation or a dissenter, in favor of any other party, if the court finds that the party against whom the fees and expenses are assessed acted arbitrarily, vexatiously, or not in good faith with respect to the rights provided in this chapter.

Iowa Code § 490.1331(2). The trial court held the banks complied exactly with the statutory requirements. The court also held there was no showing of arbitrary, vexatious or bad faith actions on the part of the banks, stating, "[t]he banks had a basis for their payment to the dissenting shareholders which was approved by the Superintendent of Banking." The dissenters argue on appeal the banks had no legal or factual basis to support their contention that "book value" was "fair value."

■ A. *Scope of review.* An award of attorney fees and expenses is a two-step process under section 490.1331. As a prerequisite for such an award, the trial court must make a factual finding that the corporation did not substantially comply with chapter 490 or acted arbitrarily, vexatiously or not in good faith. If the court finds either fact present, the court then has discretion to award attorney and expert fees and expenses in some amount. Iowa Code § 490.1331(2) (the court "may" assess counsel and expert fees and expenses "in amounts the court finds equitable").

■ Based on this two-tiered analysis, our standard of review is also two tiered. Because appraisal actions under chapter 490 are legal actions, we review the trial court's factual findings for errors of law. *Sieg,* 512 N.W.2d at 278. Therefore, we are bound by the court's findings if supported by substantial evidence. Iowa R.App. P. 14(f)(1). If a factual basis for an award of attorney fees exists and is supported by substantial evidence, we then examine the trial court's decision to award or not award attorney fees for an abuse of discretion. *See Davis–Eisenhart,* 539 N.W.2d at 143 (reviewing decision to deny attorney fees in appraisal action for

poration in his computation of net present value of future income because he was valuing a minority block of stock. The trial court adjusted Mecredy's figures to add back the residual value.

Then the court used Mecredy's adjusted figures together with Bixenman's and Stave's net-present-value-of-future-income figures in arriving at a fair value for the stock.

abuse of discretion); *cf. AFSCME/IOWA Council 61 v. State,* 537 N.W.2d 712, 714 (Iowa 1995) (reviewing trial court's decision denying attorney fees under common law rule for abuse of discretion). The amount of any award is also reviewed for an abuse of discretion. *Cf. Vaughan v. Must, Inc.,* 542 N.W.2d 533, 541 (Iowa 1996) (reviewing amount of attorney fee award under Age Discrimination in Employment Act for abuse of discretion).

We have the additional complication here that the case was tried in equity. The parties have agreed our review is de novo; neither party contends our standard of review for the factual findings pertinent to the attorney fee issue should be different than the standard of review for the valuation issue. Therefore, we will review de novo the trial court's factual findings that the banks substantially complied with chapter 490 and did not act arbitrarily, vexatiously or in bad faith.

 B. *Existence of factual prerequisites for attorney fee award.* Because we find the banks' offer of book value to the dissenting shareholders was arbitrary, we consider that alternative of section 490.1331(2) first. Section 490.1331 does not define the term "arbitrary," so we give it its ordinary meaning. *See State v. Ahitow,* 544 N.W.2d 270, 272 (Iowa 1996); Iowa Code § 4.1(38). We look to the dictionary for guidance in determining the ordinary meaning of a word. *State v. Romeo,* 542 N.W.2d 543, 548 (Iowa 1996).

 "Arbitrary" is defined as "arising from unrestrained exercise of will, caprice, or personal preference." Webster's Third New Int'l Dictionary 110 (3d ed.1993). In the administrative context, the word "arbitrary" is generally defined as an action "without regard to the law or consideration of the facts of the case." *Norland v. Iowa Dep't of Job Serv.,* 412 N.W.2d 904, 912 (Iowa 1987); *see also Soo Line R.R. v. Iowa Dep't of Transp.,* 521 N.W.2d 685, 688–89 (Iowa 1994); *Office of Consumer Advocate v. Iowa State Commerce Comm'n,* 432 N.W.2d 148, 154 (Iowa 1988). Thus, "arbitrary" means an unreasoned decision made without regard to law or facts. We now turn to a review of the evidence as it relates to the banks' decision to offer Ziegeldorf and Arnold book value for their shares.

The president of Lake Park testified the *only* factor considered in analyzing the fairness of the banks' offer was the book value of the banks' stock. This testimony was the only evidence explaining the banks' conduct. The testimony of the experts demonstrates the banks' offer had no basis in fact or law. The banks' own expert, Mecredy, testified that book value has no relationship to fair value and that it is not a true indication of the value of the organization. He also stated that book value used as a valuation method is a liquidation approach, not a going concern valuation approach; he would not use book value to value an ongoing business. The dissenters' expert, Stave, also testified one does not know the value of a company simply by knowing its book value.

In addition to this testimony, there was other evidence undermining the reasonableness of the banks' valuation of their stock. First, the initial Hawkeye expression of interest made in May 1993 suggested a purchase price of 1.25 times book value. As we stated earlier in this opinion, this "offer" is not necessarily a reflection of fair value. Nevertheless, it should have signaled to bank management that the banks' stock might be worth more than book value. The banks made no effort, however, to ascertain the real value of their stock.

Second, M.J. Kuehl, the principal shareholder in First Security Banshares and the chairman of both banks' board of directors, obtained, as part of a dissolution of marriage, an option to purchase his former wife's shares in the banks for 1.65 times the book value. He received this option in October 1993 and exercised it just a few months after the reverse stock split. There was no evidence the value of the bank stock varied dramatically in the period between the banks' offer of book value and Kuehl's purchase of stock at 1.65 times book value. Yet the banks offered no testimony explaining why the chairman of the board would pay 1.65 times book value for stock worth only book value.

The only evidence which even arguably supports the banks' conduct in offering book value was (1) Mecredy's opinion of the fair value of the stock, and (2) the banking superintendent's approval of the book value payment. Mecredy's opinion of the fair value of the shares in both banks was a figure less than book value. As we have already noted, however, he calculated these figures by applying a minority discount which is clearly not allowed under Iowa law. Consequently, his valuations cannot provide a factual or legal basis for the banks' offer.

The banking superintendent's approval, which the Lake Park president characterized as "routine," suffers from the same defect; the superintendent may consider the number of shares to be valued as a factor influencing the reasonableness of the offered price. As we have previously discussed, the superintendent's approval is so different in nature and substance to an appraisal of fair value as to be irrelevant. We conclude the superintendent's approval cannot validate the banks' book-value offer.

In summary, the banks decided to offer book value without consideration of any other factor which might reflect the true value of the banks. The presidents of both banks and Mr. Kuehl were very experienced and knowledgeable bankers; yet they offered no justification for their decision. The evidence at trial, far from supporting the banks' action, merely underscored the lack of legal or factual basis for a book-value offer.

We conclude the banks' offer "was an unreasoned decision made without regard to law or fact." It is just such arbitrary action that an award of attorney fees was meant to deter. Therefore, we reverse the trial court's decision denying attorney fees and remand to the district court for a determination of reasonable attorney and expert fees and expenses.

Costs on appeal are taxed fifty percent each to Security State Bank, Lake Park and Security State Bank, Hartley. *See* Iowa Code § 490.1331(1) (costs are taxed to corporation unless "the dissenters acted arbitrarily, vexatiously, or not in good faith").

**AFFIRMED ON APPEAL; AFFIRMED IN PART, REVERSED IN PART, AND REMANDED ON CROSS–APPEAL.**