ELY, INC. f/k/a Microfuel Corporation, Appellant,

v.

Allen C. WILEY, Appellee.

No. 96–1725.

Supreme Court of Iowa.

Dec. 23, 1998.

Stephen J. Holtman, Richard G. Hileman, Jr., and Leonard T. Strand of Simmons, Perrine, Albright & Ellwood, PLC, Cedar Rapids, for appellant.

Tom Riley and Mark E. Liabo of Tom Riley Law Firm, P.L.C., Cedar Rapids, for appellee.

Considered by HARRIS, P.J., and CARTER, LAVORATO, NEUMAN, and SNELL, JJ.

CARTER, Justice.

This appeal is taken in a statutory valuation proceeding relating to the stock of appellee, Allen C. Wiley, in the appellant-corporation, Ely, Inc. f/k/a Microfuel Corporation (Microfuel). The transaction that gave rise to this dispute was the sale of substantially all of the property of the corporation in other than the usual course of business to Fuller Corporation. Wiley dissented from that sale pursuant to Iowa Code section 490.1302 (1993).

Following a trial to the court in March 1994, the district court valued Wiley's stock at forty cents per share immediately prior to the Fuller Corporation sale. When Microfuel challenged that finding on appeal, the court of appeals reversed the district court's ruling on the basis that it had relied on an improper reason for discounting the testimony of Microfuel's expert witness. On remand the district court, after purporting to comply with the mandate of the court of appeals with respect to the testimony of the particular expert witness, reaffirmed its prior finding that the stock was worth forty cents per share.

Microfuel again appealed, and the court of appeals again reversed and remanded, once again faulting the district court's reasons for discounting the testimony of Microfuel's expert witness. We granted further review. After reviewing the record and considering the arguments presented, we vacate the latest decision of the court of appeals and af-firm the August 28, 1996 judgment of the district court.

Microfuel was a company formed in 1988 by Wiley, two energy suppliers (IES Industries and Midwest Resources), and a venture capital company (Arete Ventures) for development and sale of a process to grind coal and other substances into fine powder that may be utilized in coal-fired power plants to reduce air pollution. Wiley had been involved in this effort for several years. He held patents for the process under development, which the new corporation acquired.

The original stock subscription was for twenty-five cents per share. After the initial capitalization, further stock subscriptions occurred. Because these additional subscriptions were based on the need to maintain operating capital, the sums paid for the newly issued shares were determined on an arbitrary need-for-cash basis. At the time of the present transaction, the average price paid by all shareholders was forty-three cents per share on 7,889,875 shares. The largest shareholder, IES Industries, had invested more than $2 million by the end of 1990.

Because its product was in development, Microfuel had virtually no sales revenue while incurring substantial operating expenses. It incurred a net loss of $621,133 in 1991 and suffered over $2.8 million in net losses from 1988 through 1992. In the summer of 1991, Microfuel's board of directors sought to address the company's cash crisis by contacting each shareholder and attempting to raise additional capital at twenty cents per share. Except for IES Industries, all of the remaining shareholders were unwilling to invest additional funds on those terms.

When the board of directors met in August 1991, Microfuel had only enough cash reserves to keep the company afloat for approximately one month. At this time, it decided that it should attempt to locate a strategic partner for purposes of marketing its product. Fuller Corporation was a prospect for this purpose. In the meantime, IES Industries provided additional financing in the form of a convertible demand note under which it advanced more than $350,000 to the corporation. Under the terms of that note, all sums borrowed by Microfuel were due

and owing to IES Industries on April 1, 1992, unless that note holder elected to convert the balance due into Microfuel stock at twenty cents per share. IES Industries later extended the note's due date until April 30, 1992.

Although Microfuel and Fuller Corporation discussed the latter becoming involved in the enterprise as a strategic partner, Fuller Corporation preferred to acquire Microfuel outright. It ultimately offered to buy all of the assets of the company for $750,000 in cash, plus future royalties over a seven-year period not to exceed $6.5 million. While the Fuller offer was pending, Wiley put together his own offer to buy the company that was virtually identical to Fuller's. On September 2, 1992, Microfuels board of directors chose the Fuller Corporation offer over Wiley's offer. IES Industries and three of the five remaining minority shareholders voted in favor of the Fuller proposal. Wiley voted against the Fuller proposal, and one shareholder abstained. Wiley subsequently perfected a dissent from the transaction with respect to his twelve percent minority interest in the corporation.

In valuing Wiley's dissenting shares pursuant to the statutory appraisal process, the board of directors of Microfuel determined the fair value thereof to be "the amount of cash currently available for distribution to Mr. Wiley in proportion to his shares (twelve percent of all outstanding shares)" and an assignment in kind of twelve percent of any future royalties to be received from Fuller pursuant to the sale agreement. The amount of cash available for distribution to Wiley in proportion to his shares was determined to be $24,200, a sum that was tendered to him plus statutory interest. His rejection of that offer prompted this pending litigation. Other facts that are relevant to the appeal will be discussed in connection with our consideration of the legal issues presented.

## I. *Prior Proceedings.*

A. *The first district court decision.* The district court initially ruled on the disputed valuation issue on August 31, 1994. In its decision, the court detailed the financial history of the company and then reached a conclusion as to the value of Wiley's shares by analyzing the conclusions of the two expert witnesses that testified at trial. These witnesses were Paul Much, who testified for the corporation, and Yale Kramer, who testified for Wiley.

Microfuel's witness, Much, had testified that the transaction in which all of the assets of the corporation were sold to Fuller Corporation was an accurate reflection of the value of the outstanding Microfuel shares. Because Microfuel retained the debts of the company, Much believed that the value of the shares was the pro rata interest of each shareholder in the remaining cash from the Fuller Corporation sale after those debts had been paid in full. He also acknowledged that some basis should be provided for granting Wiley his proportionate share of any future royalties that might be paid the corporation under the terms of the sale. In sum, it was Much's testimony that the corporation's determination of fair value was correct.

Wiley's witness, Kramer, believed that the Fuller Corporation transaction was not an accurate measure of the fair value of Wiley's stock for two reasons. The first reason was temporal, i.e., that the value of a company after all of its assets have been sold is not a fair measure of its value immediately prior to the sale, which is the time that valuation for purposes of section 490.1301(3) is to be made. Kramer's second reason for finding the Fuller Corporation sale to be an unreliable measure of value was the language in section 490.1301(3) that excludes, as evidence of value, "appreciation or depreciation in anticipation of the corporate action," which gives rise to the dissenter's rights.

Kramer based his opinion concerning the value of Wiley's shares on a combination of factors, many of which included affirmations of the value of the company and its stock by the corporation's own financial analysts or analysts employed by the controlling shareholder, IES Industries. Based on these various factors, Kramer valued Wiley's stock at forty cents per share immediately prior to the transaction.

The district court rejected Much's testimony for the same grounds that Wiley's expert

witness, Kramer, had rejected it and also because the district court found:

> [E]vidence from witnesses involved indicates Ely, Inc. [Microfuel], was essentially out of money and the note held by IES, the major shareholder, had been called. It appears ... from the seller's standpoint this really was a compulsion sale. Ely, Inc. [Microfuel], had very few options available at the time of the sale.

The court then analyzed Kramer's testimony as follows:

> [T]he court is faced with deciding whether or not Mr. Kramer's valuation is reliable. This court now finds Mr. Kramer's valuation is reliable and appropriate. He considered all of the evidence and documentation available and he further has the background and expertise to make said valuation. The court now accepts his valuation and adopts it and hereby finds the value of Defendant Wiley's shares immediately prior to the Fuller asset sale was 40 cents per share.

As previously noted, Kramer's valuation assumptions were based on affirmations of the value of the company and its stock by the corporation's own financial analysts or analysts employed by IES Industries.

B. *The first appeal.* On the first appeal, the court of appeals concluded that the district court was wrong in automatically rejecting the Fuller Corporation transaction as some evidence of the value of Wiley's shares based on the reasons advanced by Kramer. It correctly noted that only "appreciation or depreciation in anticipation of the transaction" is placed beyond the court's consideration as evidence of value by section 490.1301(3). *Ely, Inc. v. Wiley,* 546 N.W.2d 218, 221 (Iowa App.1996) *(Wiley I).* No claim had been made in the present valuation dispute concerning either appreciation or depreciation in anticipation of the transaction. The court of appeals also properly rejected the district court's suggestion that for temporal reasons tied to the statutory language the price paid in the sale of a corporation may not be a proper measure of its value prior to the sale transaction. Based on these conclusions, the court of appeals remanded the case to the district court "to reconsider applying the proper legal standard." *Id.* In so doing, the court gave no consideration to the other ground on which the district court had rejected Much's testimony, *i.e.,* that the sale was not reflective of a free market transaction.

C. *The second district court decision.* Following remand on the first appeal, the district court again rejected Much's opinion as to value based on the Fuller Corporation sale for the reason that the sale was not a market-based transaction. It again credited Kramer's opinions concerning the valuation of the stock. It reaffirmed its prior finding that the stock was worth forty cents per share immediately prior to the Fuller Corporation sale. Microfuel again appealed.

D. *The second appeal.* On the second appeal, the court of appeals concluded that the district court's conclusion that the Fuller sale was not reflective of a free market transaction was flawed. The court observed in this regard:

> We find the district court erred in finding the Fuller sale constituted a forced transaction, and in rejecting the opinion testimony of Much.
>
> The definition of fair market value is based upon a hypothetical buyer and seller under no compulsion to act in the marketplace. Concepts related to a hypothetical analysis, however, should not be applied to an actual transaction between an actual buyer and an actual seller. The factors and circumstances underlying the transaction involving the disputed property are properly considered.
>
> It was for the district court to assign weight to the opinions expressed by the experts, but it was error to completely reject the opinion of Much because he considered the Fuller sale. Ely [Microfuel] was facing severe financial problems. It lacked sufficient reserves to pay its debts. It looked for additional investors and ultimately entertained purchase offers from three sources. The Fuller sale was a relevant transaction and Ely [Microfuel] was not a hypothetically compelled seller.

Based on these conclusions, the court of appeals reversed the second decision of the

district court and remanded pursuant to the following mandate:

> The court is directed to consider the opinions of both experts. We leave it to the court to determine the relative weight to be given to each expert opinion.

## II. *Issues on Further Review.*

In our review of the second court of appeals decision, we must potentially consider two matters: first, whether the district court rejected the testimony of Microfuel's expert witness for improper reasons in its decision following remand on the first appeal. If we conclude that the trier of fact's reasons for rejecting Much's testimony were not invalid, then we must consider Microfuel's contentions that the district court's valuation of forty cents per share is not supported by substantial evidence when the record is considered as a whole. We ultimately consider both of these questions.

■ A. *The district court's rejection of the opinion of Microfuel's expert witness.* Following remand on the first appeal, the district court did reconsider testimony of Microfuel's expert witness, Much, and again rejected it. It did so, not on the grounds found to be improper in the first court of appeals decision, but on another ground that had not been considered by the court of appeals on the first appeal. That ground was the district court's belief, expressed in both its first and second decisions, that the Fuller Corporation sale was not a market-based transaction. It expressed this view as follows:

> [T]his court finds the sale was closer to a compulsion sale than a market-based transaction. Ely, Inc., was out of cash. The note which was held by IES, the majority shareholder, had been called. IES had no interest as the major shareholder in continuing the business. They wanted out. They wanted to sell. . . . Fuller was the only "real" suitor. If IES and other shareholders wanted out, there really were no other options. Ely, Inc. was in fact a super motivated seller in this instance, feeling quite a bit of compulsion.

We conclude that this was a permissible conclusion based on the evidence.

The court of appeals in the second appeal failed to distinguish between the facts of the underlying transaction and the expert opinion that Microfuel's witness derived from those facts. The court of appeals was correct in concluding that the circumstances of the Fuller Corporation transaction are relevant evidence in seeking to establish the value of the Microfuel corporation, but the point of contention concerns the reliability of the opinion that the expert witness, Much, derived from those circumstances. The view of the court of appeals that the actual transaction need not be scrutinized for free market indicia in order to support Much's opinion as to value was not the view of the witness himself. Mr. Much conceded in his testimony that his analysis was valid only if the corporation was not under some compulsion to sell. We conclude that there are sufficient circumstances in the record to support the district court's conclusion that the corporation was acting under some compulsion.

■ The second opinion of the court of appeals appears to require the district court to assign some weighted value to the Much valuation testimony, however imperfect the trier of fact finds it to be, and to apply that weighted value in some formula that the court derives to determine fair value from all of the evidence. That is precisely what this court has decided that triers of fact in fair value cases do not have to do. *See Richardson v. Palmer Broadcasting Co.*, 353 N.W.2d 374, 378 (Iowa 1984) (testimony as to a particular element may appear to the court to be so unreliable that it has no place in influencing the final result).

We are also persuaded that, irrespective of whether the Fuller Corporation transaction was labeled a forced sale or a market-influenced transaction, there were other reasons for the district court to opt for Kramer's opinion over Much's opinion. Within the ambit of its critical fact-finding, the district court did not ignore Much's expert opinion—it simply found that it was an inaccurate expression of the value of Wiley's stock. The Much testimony then simply gave way to Kramer's valuation testimony, which the dis-

trict court found to be more reliable. We find nothing improper in this route to determining fair value if Kramer's testimony, buttressed by other relevant factors in the record, could be credited by a reasonable fact finder. We separately consider that issue.

■ *B. Whether the district court's finding of the value of Wiley's stock is supported by substantial evidence.* In concluding that Wiley's stock was worth forty cents per share immediately prior to the Fuller Corporation sale, the district court relied heavily on the opinion of Wiley's expert witness, Yale Kramer. Kramer's approach to valuing the Microfuel stock was based largely on indicia of value expressed by management of the corporation or by analysts employed by the controlling shareholder, IES Industries, at a time when there was no threat of litigation. Kramer believed that the company's pricing of its stock at one dollar per share in an effort to sell additional shares to Duke Power Company in June 1992 was significant, although he believed that the price was inflated. He opined that it was perhaps worth eighty cents per share at that time.

A discounted cash flow analysis prepared by Microfuel in March 1992 estimated the per share value of the company's stock at between $1.08 per share and $1.67 per share based on twenty percent and fifteen percent discount rates, respectively. Kramer believed that a thirty percent discount rate was more realistic that would have produced a per share value of approximately forty-five cents per share in March of 1992. Between that time and the time of sale, Kramer believed it was significant that the chairman of the board was expressing the view at a director's meeting in July 1992 that the company was worth $7–9 million (eighty-eight cents per share to $1.14 per share) at a time when the Fuller Corporation proposal was being considered.

A discounted cash flow analysis based solely on the terms of the Fuller sale ($750,000 cash payment and a projected six years of royalty payments) indicated a per share value of between thirty-two cents per share and forty-nine cents per share, depending on the discount rate employed. Kramer did not believe that the exhaustion of the company's

operating capital was a factor that forced the value of its stock below forty cents per share. That opinion was based on opportunities available to the corporation to participate in a joint venture with the Tennessee Valley Authority that would offer another financing source.

In attacking Kramer's figures, Microfuel suggests that the eighty-cent per share valuation in January 1992 was the lynchpin of all of his subsequent analysis. Because, Microfuel argues, the eighty cents per share estimate is purely speculative, the valuation analysis built on that estimate falls like a house of cards. We reject this contention for two reasons. First, valuation of a company whose product is still in the development stage is necessarily speculative. Although the venture was perhaps speculative from the onset, it was not demonstrably more speculative at the time the decision to sell was made than at times prior thereto when the view of the majority shareholders was full speed ahead. The eighty-cent per share figure seems high but was not outside the range of the evidence that might support that valuation estimate in January 1992. Second, and perhaps of more significance, is the fact that Kramer's determination of the value of the stock subsequent to the offer to Duke Power Company was influenced primarily by newly generated discounted cash flow projections that were in no way tied to an eighty-cent per share value in January of 1992.

In *Sieg Co. v. Kelly*, 512 N.W.2d 275, 278 (Iowa 1994), we interpreted section 490.1330 enacted as 1989 Iowa Acts chapter 288, section 143 (effective December 31, 1989) as effecting a change in the method of trial and scope of review for actions of this nature. We observed that under prior law the statutory appraisal action was in equity, and our review was de novo. *Sieg,* 512 N.W.2d at 278. We concluded that after the 1989 amendment such proceedings are actions at law in which the findings of the district court are binding on an appellate court if supported by substantial evidence. *Id.* For the reasons that we have previously outlined, we conclude that the district courts valuation of Wiley's stock is supported by substantial evidence.

No doubt it will come as a surprise to the other shareholders of Microfuel that the

amount now due Wiley under the district court's valuation of his stock exceeds the amount of cash available for redeeming the shares of all of the shareholders in the company. That result might be tempered, however, if the future royalties payable under the Fuller Corporation sale, which, under the district court's decision, will belong to the shareholders other than Wiley, approach the levels anticipated in the company's July 1992 discounted cash flow analysis.

### C. *Other contentions.*

■ 1. Microfuel urges that we alter the standard of proof for judicial valuation of the shares of a dissenting shareholder to conform to the principles established in *Principles of Corporate Governance: Analysis and Recommendations* § 7.22(b) (1994) promulgated by the American Law Institute. Under that proposal, the price accepted by the board of directors is presumed to represent the fair value of the corporation unless the dissenter can prove otherwise by clear and convincing evidence. We believe that to adopt such a standard by judicial fiat would be an unwarranted alteration of the existing statutory scheme. Consequently, we decline Microfuel's invitation to adopt the American Law Institute proposal.

■ 2. Throughout the litigation, Wiley has urged the court to award attorney fees pursuant to Iowa Code section 490.1331. To do so would require a finding that the corporation did not substantially comply with the statutory requirements or acted arbitrarily, vexatiously, or not in good faith. The record does not support a finding of such conduct on behalf of the corporation. Consequently, Wiley's claim for attorney fees is rejected. We have considered all issues presented and conclude that the decision of the court of appeals should be vacated. The judgment of the district court is affirmed. Costs of appeal are assessed to the appellant.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**