# IN THE SUPREME COURT OF IOWA

No. 19–2151

Submitted December 16, 2020—Filed June 18, 2021

**SUSAN A. GUGE** and **PEGGY MCDONALD,**

Appellees,

vs.

**KASSEL ENTERPRISES, INC.,**

Appellant,

CRAIG L. KASSEL, DEBORAH M. KASSEL, KASSEL FARMS, INC., and GREAT OAKS FARMS, INC.,

Defendants.

---

Appeal from the Iowa District Court for Palo Alto County, Charles K. Borth, Judge.

The parties appeal the district court's "fair value" determination of the plaintiffs' shares in an election-to-purchase-in-lieu-of-dissolution proceeding, and the defendant also appeals an award of fees and expenses in the plaintiffs' favor. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

McDermott, J., delivered the opinion of the court, in which Christensen, C.J., and Appel, Waterman, and Mansfield, JJ., joined, and in which McDonald and Oxley, JJ., joined except for division III.B. Oxley, J., filed a special concurrence, in which McDonald, J., joined.

Thomas D. Hanson (argued) and Emily A. Staudacher of Dickinson, Mackaman, Tyler & Hagen P.C., Des Moines, for appellant.

Seth R. Delutri (argued), Mark C. Feldmann, and Justin E. LaVan of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellees.

**McDERMOTT, Justice.**

Shareholders in Iowa corporations may sue to dissolve a corporation when those in control have engaged in oppressive conduct. But in lieu of defending a dissolution proceeding, the law allows the corporation to force the complaining shareholders to sell their stock for the "fair value" of their shares. This statutory buyout right provides a chance for those in control to avoid both the tribulations that come with defending against the misconduct claims and, presumably, the future grief that comes with trying to run a business with antagonistic shareholders. Because filing for dissolution could result in the forced sale of the filer's own stock, this buyout right also helps deter shareholders from strategic abuse of dissolution petitions.

If the parties can't agree to a stock valuation on their own, the "fair value" determination rests with the court. In this appeal, the parties ask us for the first time to address a "fair value" determination under Iowa's election-to-purchase-in-lieu-of-dissolution statute. In particular, we must decide what adjustments should be made in this case to the corporation's asset values to set the "fair value" of the plaintiffs' shares and whether the petitioning shareholders established that probable grounds of oppression existed to permit the district court's award of their fees and expenses.

## I. Factual and Procedural Background.

Lawrence and Georgia Kassel owned a family farming operation that they incorporated in 1977 under the name Kassel Enterprises, Inc. They had three children: Susan Guge, Peggy McDonald, and Craig Kassel. Lawrence passed away in 2005; Georgia in 2017. Through a series of gifts of stock during their lives, bequests in their wills after their deaths, and Craig's purchase of additional shares from his mother after his father's death, Lawrence and Georgia ultimately transferred all of the corporation's

stock to their children. At the time this lawsuit arose, Susan and Peggy each owned 23.75% of the corporation's shares and Craig the remaining 52.5%.

After Georgia's death, Susan and Peggy filed a lawsuit against Craig, Craig's wife, two of Craig's separately-owned corporations, and Kassel Enterprises. Count I of the lawsuit sought judicial dissolution of Kassel Enterprises under Iowa Code section 490.1430(1)(b)(2) (2018) (for "illegal, oppressive, or fraudulent" conduct) and section 490.1430(1)(*b*)(4) (for waste or misapplication of corporate assets). Five additional claims, counts II through VI, sought money damages based on claims for breach of fiduciary duty, fraud, breach of contract, third-party beneficiary rights, and civil conspiracy. The defendants denied the claims and added three counterclaims against Susan and Peggy.

Kassel Enterprises invoked Iowa Code section 490.1434, electing to purchase Susan and Peggy's shares for fair value in lieu of a judicial dissolution of the corporation. Because the parties failed to reach their own agreement on the fair value of the shares within sixty days, the district court set the matter for a hearing to determine the fair value of Susan and Peggy's shares for the buyout. *See* Iowa Code § 490.1434(4) (requiring the district court, upon application of any party, to determine the fair value of the petitioner's shares if the parties are unable to reach an agreement within sixty days).

In the interim, the parties filed motions for summary judgment on the other claims in the case. Before the summary judgment hearing, Susan and Peggy voluntarily dismissed all of their claims against the defendants in counts II through VI except for part of their breach of fiduciary duty claim in count II against Craig and his wife. Craig and his wife likewise dismissed one of their counterclaims.

The district court used an asset-based method to calculate the fair value of the shares. It started with the parties' agreed valuation of the corporation's total assets ($5,804,403), then subtracted the corporation's total liabilities ($22,046), to arrive at a total shareholder equity of $5,782,357. Dividing the total shareholder equity amount by the number of outstanding shares (847), the district court determined that the fair value of each share was $6826.87. Susan and Peggy each owned 201.165 shares, so their respective shareholdings totaled $1,373,327. The district court didn't apply any discounts urged by Craig for transaction costs or tax liabilities for built-in gains associated with a hypothetical sale of corporate assets, and it didn't apply any additions as urged by Susan and Peggy based on Craig's alleged waste and misapplication of corporate assets. The district court granted Susan and Peggy's request for an award of reasonable fees and expenses of their attorneys and expert witnesses under Iowa Code section 490.1434(5) of $93,620.74 and $6540, respectively. The district court directed the purchase of Susan and Peggy's stock through an installment plan payable over five years and secured by personal guarantees from Craig and his wife and the shares of stock. *See* Iowa Code § 490.1434(5) (authorizing the court to order payment in installments and to provide for security to assure payment).

In its ruling on the motions for summary judgment, the district court ruled in Craig's favor on count II, finding that the claims of wrongdoing by Craig and his wife required a finding of injury to Kassel Enterprises as a corporate entity, not injury to Susan and Peggy as individual shareholders, and thus were "derivative" claims. Determining that the substantive and procedural requirements for bringing derivative claims had not been met, the district court dismissed count II. The district court ruled in Susan and

Peggy's favor on Craig's counterclaims for equitable setoff and unjust enrichment.

No party appeals any summary judgment ruling, but both sides appeal the district court's determination of fair value. Craig argues the district court erred in determining the fair value of Susan and Peggy's shares without any discount for transaction costs or built-in gain taxes, and in awarding their attorney fees and expert expenses against the corporation. In a cross-appeal, Susan and Peggy argue that the district court erred in failing to increase the fair value of their shares based on Craig's alleged waste and misapplication of Kassel Enterprises' assets.

## II. Standard of Review.

Corporate dissolution actions are equitable in nature, so our review is de novo. *See Baur v. Baur Farms, Inc.*, 832 N.W.2d 663, 668 (Iowa 2013). In equity cases, we aren't bound by the district court's factual findings, but we generally give them weight, particularly as to witness credibility determinations. *Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 97 (Iowa 2011).

We review a district court's application of a statutory fee-shifting provision for correction of legal error. *See Seeberger v. Davenport C.R. Comm'n*, 923 N.W.2d 564, 568 (Iowa 2019). We review an attorney fee award for an abuse of the district court's discretion. *Smith v. Iowa State Univ. of Sci. & Tech.*, 885 N.W.2d 620, 624 (Iowa 2016) (per curiam).

## III. Determination of Fair Value.

Iowa Code chapter 490 (the Iowa Business Corporation Act) grants the court authority to dissolve a corporation in shareholder proceedings where "[t]he directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent" or where "corporate assets are being misapplied or wasted." Iowa Code

§ 490.1430(1)(*b*)(2), (4) (2018).  But the corporation (or, if the corporation fails to exercise the right, other shareholders) may avoid dissolution proceedings with an irrevocable election "to purchase all shares owned by the petitioning shareholder at the fair value of the shares."  *Id.* § 490.1434(1).  An order directing the purchase of a petitioning shareholder's shares requires the court to dismiss the dissolution claim and extinguishes all the petitioning shareholder's rights as a shareholder.  *Id.* § 490.1434(6).

Section 490.1434 doesn't define "fair value," but appraisal rights provisions in the same chapter of the Code state that fair value is determined "[u]sing customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal" and "[w]ithout discounting for lack of marketability or minority status."  *Id.* § 490.1301(4)(*b*)–(*c*); *see also Baur*, 832 N.W.2d at 669 n.5 ("Our legislature made a policy decision when it adopted the current definition of 'fair value.'  By not allowing a discount for lack of marketability or minority status, the legislature implicitly required shares to be valued on a marketable, control interest basis." (quoting *Nw. Inv. Corp. v. Wallace*, 741 N.W.2d 782, 787–88 (Iowa 2007))).

Fair value represents a shareholder's pro rata share of the value of the corporation as a going concern.  *See Nw. Inv. Corp.*, 741 N.W.2d at 787; *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144 (Del. 1989).  We've long discussed the challenges in ascertaining the fair value of stock in a closely-held, operating business.  *See Sieg Co. v. Kelly*, 512 N.W.2d 275, 279–80 (Iowa 1994).  For starters, shares of most closely-held businesses have no established market, so we must first determine which of several different appraisal methodologies might best befit "the particular circumstances of the corporation involved."  *Richardson v. Palmer Broad.*

*Co.*, 353 N.W.2d 374, 376–77 (Iowa 1984) (quoting 13 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations*, § 5906.12, at 286 (rev. perm. ed. 1980)). We've discussed three of the more common appraisal methods—market value, investment value, and net asset value—in our caselaw. *See Davis–Eisenhart Mktg. Co. v. Baysden*, 539 N.W.2d 140, 142 (Iowa 1995).

The experts for both sides in this case agreed on a net asset value approach. They independently deemed this methodology best suited for Kassel Enterprises' fair-value determination because an overwhelming proportion of the entity's value rested in its farmland holdings as opposed to income generated in ongoing operations. *See Sec. State Bank v. Ziegeldorf*, 554 N.W.2d 884, 891–92 (Iowa 1996) (explaining that net asset value "offered 'protection to the minority stockholder in a corporation with a poor earnings record' where the value of the corporation as a going concern might be less than its liquidation value" (quoting *Woodward v. Quigley*, 257 Iowa 1077, 1083, 133 N.W.2d 38, 41 (1965), *modified on reh'g*, 257 Iowa 1077, 136 N.W.2d 280 (1965))). The value of the corporation's farmland assets totaled $5,616,667, with the remainder in accounts receivable, cash and cash equivalents, and other property and equipment. Using the asset-based approach, the parties' experts started by calculating the aggregated appraised market values of the corporation's assets ($5,804,403) and subtracted its liabilities ($22,046). The district court stopped here and used this number—$5,782,357—as the numerator in calculating the fair value of the corporation's shares.

Craig contends that the fair value of his sisters' shares must include deductions for (1) theoretical transaction costs in a potential sale of the assets, and (2) potential capital gains tax liability on the corporation's assets. With these proposed deductions—$449,733 in transaction costs

and $1,458,500 in capital gains tax—Craig argues that the total shareholder equity for purposes of determining the fair value of his sisters' shares (the numerator) is actually $3,874,100. Craig asserts that the district court's failure to apply these deductions risks allowing the minority to oppress the majority. *See Baur*, 832 N.W.2d at 678 (stating that "courts must be careful when determining relief to avoid giving the minority a foothold that is oppressive to the majority").

**A. Deduction of Transaction Costs.** Having decided on a valuation method, we must first resolve whether the district court correctly held that no transaction costs from a hypothetical sale of the assets should be included in the valuation. The district court reasoned that, in a fair-value determination, transaction costs in a liquidation aren't components of a corporation's value as a going concern without some evidence that the liquidation is contemplated in the corporation's ongoing operation. The district court found no evidence of a contemplated liquidation of any of Kassel Enterprises' assets and, thus, held that no transaction costs of a purely hypothetical liquidation should be imposed in the determination of fair value.

Yet in this case, both parties' experts agreed that a deduction for transaction costs based on a hypothetical liquidation of Kassel Enterprises' assets should have been included; they simply disagreed on the amount. Craig's expert opined that the transaction costs for a hypothetical sale of Kassel Enterprises' assets would fall in a range between 6% and 10%, and he ultimately chose the midpoint, an 8% discount (equating to $449,733). Susan and Peggy's expert also deducted for hypothetical transaction costs in his calculation, but at the lower rate of 3% (equating to $173,471). The difference largely reflected a disagreement about a hypothetical commission rate for the sale of the

farmland. Craig's expert testified to having contacted two independent farm property sales companies who estimated sales-related costs between 6% and 10% depending on a number of factors. Susan and Peggy's expert based the rate on auctioneer fees of 2% ($115,647) and then added 1% ($57,824) to cover any remaining closing costs, advertising costs, abstracting costs, legal fees for conveyance documents, and closing agent's fees.

Persuaded as we are in this case by the parties' experts, both of whom included transaction costs in their valuations under a net asset approach, we find that the district court's failure to reduce the asset values to account for the costs to liquidate Kassel Enterprises' assets warrants reversal. The district court, having determined that no transaction costs should be included in calculating the value of corporate assets, stopped short of making any finding about the deduction that we've now determined must be applied. We find the record lacking in sufficient detail for us to make this important determination. "[W]hen essential to effectuate justice, an equity case may be remanded for such further proceedings as the circumstances may require." *Dee v. Collins,* 235 Iowa 22, 28, 15 N.W.2d 883, 887 (1944). We thus remand for the district court to determine and apply the appropriate deduction of transaction costs to the value of the corporation's assets in setting the fair value of Susan and Peggy's shares.

**B. Deduction of Built-In Gain Tax.** Craig argues that the district court also erred in failing to deduct the tax consequences of built-in gains on the corporation's assets and that, as a result, Susan and Peggy will escape paying taxes on the corporation's appreciated assets that he solely (and unfairly) will now bear alone. Applying a 30.8% effective tax rate to calculate the built-in tax, Craig's expert calculated a potential tax liability

of $1,458,500. Craig urges that the district court erred in failing to deduct this tax liability in determining the value of the corporation's net assets.

A "built-in gain" tax refers to the tax on an asset's appreciation from its adjusted tax basis. *See* 26 U.S.C. § 1374(d)(1) (2018). The built-in gain for an asset in an IRS subchapter S corporation that has converted from a subchapter C corporation (as Kassel Enterprises did in 2007) calculates the appreciation looking at the asset's value at two points in time: the asset's *current* fair market value and the asset's adjusted basis *at the time of the conversion*. *See id.* The assets Kassel Enterprises holds (in particular, its farmland) have increased in value since the corporation converted to an S corporation in 2007.

The district court keyed in on the corporation's status as an IRS subchapter S corporation, as opposed to a subchapter C corporation, in ruling that no built-in gain deduction applied. With a C corporation, a sale of assets triggers income tax on capital gains at the *entity* level (with the corporation obligated to pay the tax), arguably making the remaining shareholders responsible for the tax without any contribution from the departed shareholders. But this doesn't hold true for the same asset sale by an S corporation because an S corporation pays no income tax at the entity level. Rather, tax is paid at the individual shareholder level, with taxable gain passed onto the departing shareholder. *See id.* § 1363(a). Because of this difference in tax treatment, Susan and Peggy in selling their stock will be assessed the tax liability resulting from appreciation of their stock. To apply a tax deduction in the district court's determination of fair value *on top of* the tax consequences Susan and Peggy individually already face through the S corporation's pass-through of taxes would (as Craig's expert conceded) impose a double tax of sorts on Susan and Peggy. *See Matthew G. Norton Co. v. Smyth*, 51 P.3d 159, 169 (Wash. Ct. App.

2002) (holding that because S corporations usually avoid double taxation, a discount would not be appropriate unless the record showed dissenting shareholders had not paid built-in gains tax); James S. Eustice & Joel D. Kuntz, *Federal Income Taxation of S Corporations* § 7.1 (4th ed. 2013).

Craig concedes it's possible that he could altogether avoid the potential taxes on gains associated with Kassel Enterprises' assets that he seeks to deduct from the fair-value calculation. If, for instance, Craig doesn't direct the corporation to sell the assets and transfers his stock to his children at his death, his children would enjoy a step-up in basis at the time of the transfer without any unfavorable tax consequences. Indeed, Craig testified to his intention that the corporation *not* sell any of its farmland.

Craig cites no cases, and we can find none, for the proposition that a fair-value determination for departing shareholders must include a deduction for built-in tax gains where no sale of assets is contemplated. The weight of authority on the issue of tax deductions in fair-value determinations angles sharply the other direction: that courts should *not* discount for tax consequences where no liquidation triggering those tax consequences was contemplated. *See, e.g., Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 554 (Del. 2000); *Hansen v. 75 Ranch Co.*, 957 P.2d 32, 42–43 (Mont. 1998); *In re 75,629 Shares of Common Stock of Trapp Fam. Lodge, Inc.*, 725 A.2d 927, 934 (Vt. 1999); *Matthew G. Norton Co.*, 51 P.3d at 168; *Brown v. Arp & Hammond Hardware Co.*, 141 P.3d 673, 688 (Wyo. 2006). When valuing a corporation's assets in a fair-value determination, tax consequences should be considered "only in the most limited circumstances," which in most cases means "only when a sale of those assets is imminent and unrelated to the transaction" that triggered the petitioning shareholders' action. *Brown*, 141 P.3d at 688–89 (quoting

Cecile C. Edwards, *Dissenters' Rights: The Effect of Tax Liabilities on the Fair Value of Stock*, 6 DePaul Bus. L.J. 77, 99 (1993)); *see also Matthew G. Norton Co.*, 51 P.3d at 168–69.

The record in this case lacks evidence of any actual or contemplated liquidation of assets associated with Craig's election to purchase Susan and Peggy's shares in lieu of dissolution that would create any tax consequences impacting the corporation's value as a going concern. "In the absence of specific facts about a prospective sale, '[i]t would be the basest form of speculation to attempt to determine tax consequences of a voluntary liquidation of assets at an unknown future time.' " *Brown*, 141 P.3d at 689 (quoting *Hall v. Hall*, 125 P.3d 284, 289 (Wyo. 2005)); *see also Bogosian v. Woloohojian*, 158 F.3d 1, 6 (1st Cir. 1998) (stating that no potential capital gains taxes should be deducted from the valuation of real property "if there were no plans to sell any of the properties at any time in the foreseeable future, because none of the liabilities would be incurred unless the properties were sold"). Deducting for hypothetical tax consequences that an entity might well minimize or evade altogether through strategic action would be inappropriate in determining fair value under section 490.1434. We thus decline to adjust for the built-in tax consequences urged by Craig in determining the fair value of Susan and Peggy's shares in this case.

The hypothetical tax ramifications that Craig asks us to apply differ from the assumed liquidation costs we applied above. Again, the parties' experts agreed that liquidation costs are components of the net asset methodology. But they clashed on the tax ramification issue. Permitting deductions for uncontemplated and avoidable tax ramifications in determining fair value might invite abuse through the purchase-in-lieu-of-dissolution process. Consider a situation in which a controlling

shareholder oppresses a minority shareholder and instigates a petition for judicial dissolution under section 490.1430(1)(*b*)(2). The controlling shareholder could then elect to compel the sale of the petitioning shareholder's stock in lieu of dissolution under section 490.1434(1). If no actions triggering the tax had been contemplated before the dissolution filing—and may well never occur—then the court's application of a 30% discount for a hypothetical tax would permit the oppressive shareholder to reap the benefit of a buyout at a 30% discount while *retaining* all the corporate assets and *never paying* the tax himself. Under these facts, applying the discount would create a perverse incentive for the controlling shareholder and provide payment far short of "fair value" for the oppressed shareholder's shares.

**C. Addition of Wasted or Misapplied Corporate Assets.** Susan and Peggy argue that the district court erred in failing to increase the fair value of their shares to account for Craig's alleged waste and misapplication of corporate assets. Their briefing on appeal largely points to two other rulings by the district court that they believe support increasing the fair-value determination in this way: the ruling granting their attorney fee claim against Craig under section 490.1434(5) and the ruling dismissing their direct fiduciary duty claims in count II as a derivative claim belonging to the corporation.

Craig argues that error wasn't preserved for appeal on this issue. The district court's written ruling that detailed its fair-value determination doesn't mention Susan and Peggy's request for an increase in the corporation's value based on Craig's alleged waste and misapplication of corporate assets. Yet the record shows Susan and Peggy requested these additions orally during the fair-value hearing. In response, the district court stated that it wouldn't consider these grounds as part of its fair-

value determination because the evidence instead bore on Susan and Peggy's breach of fiduciary duty claims in count II. The transcript of the fair-value hearing shows that Susan and Peggy raised the issue and that the district court orally ruled on it, thus preserving the issue for appeal. *See Fenceroy v. Gelita USA, Inc.*, 908 N.W.2d 235, 248 (Iowa 2018).

Craig argues—consistent with the thrust of the district court's succinct oral ruling—that Susan and Peggy's arguments seeking to add amounts for misapplication and waste to the fair-value determination in count I directly contradict their fiduciary duty claims in count II. Susan and Peggy asserted under count II that Craig and his wife's breaches of fiduciary duty in misapplying and wasting assets gave *them* a claim for damages—not that the *corporation* had a claim for damages. And if the corporation didn't have a claim, then the claim shouldn't be included in an appraisal of the corporation's assets.

Shareholders generally don't possess a claim against third parties for injuries to the corporation unless the claim is brought in a derivative action. *Cunningham v. Kartridg Pak Co.*, 332 N.W.2d 881, 883 (Iowa 1983). In a derivative action, a shareholder asserts on the corporation's behalf a claim against a third party (the "third party" often being one of the corporation's own corporate officers) when the corporation itself fails to take action against the third party. *See id.*; *see also* Iowa Code § 490.740(1) (defining "derivative proceeding"). In a direct action, by comparison, a shareholder pursues a claim to remedy her own injuries separate from harm that arises simply from being a shareholder. *Engstrand v. W. Des Moines State Bank*, 516 N.W.2d 797, 799 (Iowa 1994).

When the corporation suffers the injury, the damage to the shareholder "is normally reflected only in the decreased value of [the shareholder's] stock." *Id.* (quoting *Nicholson v. Ash,* 800 P.2d 1352, 1356

(Colo. App. 1990)). Requiring that individuals pursue these claims on behalf of the corporation—and for the corporation's benefit—prevents multiple suits against the corporation by individual stockholders on the same subject. *See id.* The derivative suit is maintained for the corporation's benefit, and success in the derivative suit results in damages payable to the corporation. *Smithberg v. Smithberg*, 931 N.W.2d 211, 217 (N.D. 2019), *reh'g denied* Aug. 22, 2019. The district court held that Susan and Peggy's direct claims against Craig and his wife required dismissal because the claims alleged harm to the corporation, not to Susan and Peggy individually, and thus were derivative rather than direct claims. As a result, Susan and Peggy failed to complete the statutory and other requirements for bringing a derivative action. *See* Iowa Code § 490.742; Iowa R. Civ. P. 1.279.

A corporation's assets generally include legal claims it possesses against others. *See In re Marriage of Keener*, 728 N.W.2d 188, 194 (Iowa 2007). And in this case, the district court (urged by both parties) used an asset-based approach in which the competing experts submitted identical valuations of the total amount of assets to determine the fair value of Kassel Enterprises' assets. Yet Susan and Peggy's expert didn't include any legal claims the corporation might possess against Craig among the list of the corporation's assets in his expert report.

As the district court found, Susan and Peggy alleged in their petition that Craig's breaches of fiduciary duty caused damages to them individually. And if the fiduciary duty claims belonged to Susan and Peggy *individually*, then those claims were not assets of *the corporation*. We can hardly criticize the district court for not considering the misapplication and waste claims to be assets of Kassel Enterprises when it would have run counter to the manner in which Susan and Peggy themselves pleaded

and pursued them in count II. Thus, the district court thus didn't err in its fair-value determination by accepting Susan and Peggy's strategic choice to pursue the fiduciary duty claims as their own individual assets and not as assets of the corporation.

## IV. Award of Attorney and Expert Fees and Expenses.

Craig complains that imposing fees against the corporation makes no sense considering Susan and Peggy filed a lawsuit asserting five independent theories of misconduct that, by the end of the case, had all been dismissed—four voluntarily and one by the district court on summary judgment. The only other claim, the petition for dissolution, was resolved through Craig's election to purchase in lieu of dissolution. Viewing the overall result as something of a shutout in his favor, Craig argues that the district court erred in requiring the corporation to pay Susan and Peggy's fees and expenses.

Attorney fees generally aren't recoverable in Iowa in the absence of a statute or a contractual provision that permits their recovery. *See Branstad v. State ex rel. Nat. Res. Comm'n*, 871 N.W.2d 291, 294 (Iowa 2015). But in this case, Iowa Code section 490.1434(5) gives the district court discretion to award petitioning shareholders their fees and expenses of counsel and expert witnesses. To do so, the district court must first find that the petitioning shareholders have "probable grounds for relief" under section 490.1430(1)(*b*)(2) (dissolution for "illegal, oppressive, or fraudulent" conduct) or subsection (1)(*b*)(4) (dissolution for corporate assets "being misapplied or wasted"). The statute focuses on whether "probable grounds" support the dissolution claim and not any other separately-pleaded counts of misconduct in the petition.

With its fee-award provision, section 490.1434 avoids making an election to purchase in lieu of dissolution a penalty-free escape hatch for

misbehaving shareholders controlling the corporation. Iowa Code section 490.1434(5) injects a potential deterrent on controlling shareholders by providing that, even if they elect to compel a purchase in lieu of defending a dissolution proceeding, they may still be held liable to some extent for the petitioning shareholders' attorney and expert fees and expenses in the case. Controlling shareholders can't engage in "illegal, oppressive, or fraudulent" conduct or "misapply[y] or waste[]" corporate assets and expect to bail themselves out with a compelled purchase while avoiding liability for the petitioning shareholders' fees and expenses in the buyout process.

The district court found no "probable grounds for relief" under section 490.1430(1)(*b*)(2) but did find probable grounds for relief under subsection (1)(*b*)(4). Craig disputes the accuracy of certain factual findings that the district court cited in holding that he misapplied corporate assets, and on those actions he doesn't dispute occurred, he asserts that no harm to the corporation resulted. But the statute speaks in terms of both waste and misapplication of corporate assets, so even a finding that no "waste" of corporate assets took place doesn't bar a finding that "misapplication" of corporate assets occurred. *See* Iowa Code § 490.1430(1)(*b*)(4) (referencing "corporate assets . . . being misapplied *or* wasted" (emphasis added)).

The district court found Craig misapplied corporate assets to benefit himself by renting Kassel Enterprises' farmland to his self-owned entities for below the land's fair market value. Craig paid "bonuses" to Susan and Peggy to make up for the favorable arrangement he'd cut for himself, but these "bonuses" didn't make up the difference and, in any event, didn't change the fact that he misapplied corporate assets. The district court also found that Craig arranged for Kassel Enterprises to take out a number

of loans and to distribute loaned funds totaling over $900,000 to one of his personal entities. Although all of the loans were ultimately repaid, the district court deemed the loans further evidence of misapplication. The district court further found that in 2016 Craig traded Kassel Enterprises' farmland with one of his own entities, flipping eighty-nine acres from Kassel Enterprises to his personal entity and a different ninety-five acres from his personal entity to Kassel Enterprises. Craig testified that his goal in the swap was to complete a building project for his own entity. The district court again found that Kassel Enterprises' assets might not necessarily have been wasted in this transaction but were nonetheless misapplied for Craig's personal benefit.

Setting aside the *how* and *what* of the district court's fee award, Craig also disputes the *who*, arguing that section 490.1434(5) doesn't permit an award of fees against the corporation itself because the corporation is merely a passive defendant in a dissolution and all of the alleged bad acts were performed by Craig. But Iowa Code section 490.1431(2) specifies that petitioning shareholders need not make any shareholders parties to a dissolution proceeding. That leaves only the corporation, by necessity, the party hit with any fee and expense awards under section 490.1434. Imposing fee awards against the corporation fits, in any event, because dissolution actions almost invariably involve (as in this case) controlling shareholders acting through and on behalf of the corporation in committing the misconduct triggering the fee award. We review a district court's applications of the law in awarding fees and expenses for correction of legal error. *See NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 469 (Iowa 2010). We hold that the district court properly applied section 490.1434(5).

An award of fees and expenses under Iowa Code section 490.1434(5) is discretionary (using the word "may"), not mandatory. We review challenges to exercises of such discretion for abuse of discretion, which is the same standard we use for the district court's determination of the amount of fees awarded. *See Smith,* 885 N.W.2d at 624. The district court reviewed Susan and Peggy's attorney fee charges in detail and eliminated fees for services that weren't attributable to the dissolution claim and associated purchase-in-lieu-of-dissolution proceedings (count I) for which fees were recoverable under section 490.1434(5). Next, having found some fees potentially associated with both litigating count I and litigating the other unsuccessful counts, the district court awarded only 40% of those mixed fees. The district court added this 40% portion of the mixed fees to the count I fees in arriving at the total attorney fee award of $93,620.74. The district court awarded all of Susan and Peggy's appraiser's fee of $6540.

A fee award will be reversed only on "grounds that are clearly unreasonable or untenable." *NevadaCare, Inc.,* 783 N.W.2d at 469. In our review of the record, we find nothing unreasonable or untenable in the district court's award of attorney and expert fees and expenses in this case.

### V. Disposition.

We reverse the district court's ruling as to the transaction costs and remand for the district court to determine and apply a discount to the value of Kassel Enterprises' assets as part of the fair-value determination of Susan and Peggy's shares. We otherwise affirm the district court's rulings in all respects.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Christensen, C.J., and Appel, Waterman, and Mansfield, JJ., join this opinion, and McDonald and Oxley, JJ., join except for division III.B. Oxley, J., files a special concurrence, in which McDonald, J., joins.

**OXLEY, Justice (concurring specially).**

The majority correctly concludes that under a net asset valuation methodology the entity-level transaction costs associated with a hypothetical sale of the farmland are deducted but any shareholder-level capital-gains taxes are not. With respect to the capital gains taxes, the majority reaches the right result but for the wrong reason. For that reason, I join all divisions of the majority opinion *except* division III.B. On the issue of the capital gains deduction, I respectfully concur only in the judgment.

Iowa Code section 490.1434 requires a corporation electing to purchase a petitioning shareholder's shares to pay "the fair value of the shares." Iowa Code § 490.1434(1) (2018). The majority starts with the correct premise that fair value should be calculated "[u]sing customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal" and "[w]ithout discounting for lack of marketability or minority status." *Id.* § 490.1301(4). Thus, fair value requires application of a customary business valuation methodology but without any shareholder-level adjustments. *See Baur v. Baur Farms, Inc.*, 832 N.W.2d 663, 669 n.5 (Iowa 2013).

"We have recognized three popular approaches to appraising stock: market value, investment value, and net asset value." *Nw. Inv. Corp. v. Wallace*, 741 N.W.2d 782, 786 (Iowa 2007). Critically, the methodologies are independent, as each "is 'designed to *independently produce the full measure of the fair value* of the stock rather than a component of fair value.'" *Id.* (emphasis added) (quoting *Richardson v. Palmer Broad. Co.*, 353 N.W.2d 374, 378–79 (Iowa 1984)). Fair value is premised on the

minority's proportionate share of the value of the entity, so that only entity-level adjustments are generally allowed for fair-value valuations. *See, e.g.*, *id.* at 787–88 (recognizing policy decision made by legislature in adopting "fair value" definition that did not allow a discount for lack of marketability or minority status); *Shawnee Telecom Res., Inc. v. Brown*, 354 S.W.3d 542, 557 (Ky. 2011) (discussing the history of dissenters' appraisal rights and recognizing lack of control or marketability discounts as shareholder-level, rather than entity-level, discounts).

"Net asset value is the share *the stock* represents in the value of the net assets of the corporation." *Sec. State Bank v. Ziegeldorf*, 554 N.W.2d 884, 891 (Iowa 1996) (emphasis added) (quoting 12B Charles R.P. Keating & Jim Perkowitz-Solheim, *Fletcher Cyclopedia of the Law of Private Corporations* § 5906.140, at 454 (perm. ed. rev. vol. 1993) [hereinafter Fletcher]); *see also* James J. Reto, *Are S Corporations Entitled to Valuation Discounts for Embedded Capital Gains?*, 3 Valuation Strategies 6, 9 (2000) ("This potential difference in *stock* value is exactly what the courts have finally recognized."). The net asset methodology is necessarily "based on a hypothetical dissolution and distribution of the corporate assets." *Sec. State Bank*, 554 N.W.2d at 891 (quoting Fletcher § 5906.140, at 455); *see also Est. of Dunn v. Comm'r*, 301 F.3d 339, 353 (5th Cir. 2002) ("Under the factual totality of this case, the hypothetical assumption that the assets will be sold is a foregone conclusion—a given—for purposes of the asset-based test. The process of determining the value of the assets for this facet of the asset-based valuation methodology must start with the basic assumption that all assets will be sold, either by Dunn Equipment to the willing buyer or by the willing buyer of the Decedent's block of stock after he acquires her stock." (footnote omitted)). Thus, a necessary component

of valuing an entity using the net asset method is considering the entity-level adjustments accompanying the hypothetical dissolution.

We explained the use of a hypothetical liquidation long ago in distinguishing between an earnings-based approach and the net asset value approach:

> Net asset value should not be influenced by earnings. We therefore prefer the Fletcher method of determining net asset value by valuing the assets as such. This offers protection to the minority stockholder in a corporation with a poor earnings record. In such instance the value as a going concern might be less than the dissolution value of the assets. It would not be fair to limit the minority interest to a value influenced by poor earnings, when the minority might prefer to liquidate and convert the assets into cash, and at the same time place the majority in a position where it could later liquidate and receive the entire benefit of the greater liquidation value. Net asset value will, in most instances, be of far less importance than the investment value of the stock, because the real value of the stock is still to be determined as in a going concern. However, net asset value as defined by Fletcher is a factor to be considered. The weight to be given this factor will depend upon the facts in each case.

*Woodward v. Quigley*, 257 Iowa 1077, 1083, 133 N.W.2d 38, 41 (1965). Here, the parties chose to rely exclusively on the net asset valuation, which protected the minority shareholders by pulling the total valuation of the entity up to a more realistic, and fair, valuation.[1] If the net asset valuation method is used, all of its parameters must be used—including the premise

---

[1]Some courts have said that a net-asset valuation cannot be the sole basis for valuing an entity as a going concern for purposes of determining a minority shareholder's pro rata interest in the entity. *See Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 554–57 (Del. 2000) (valuing an investment holding company); *Shawnee Telecom Res., Inc.*, 354 S.W.3d at 561–62, 562 n.8 (holding that net asset valuation may be a proper method for calculating dissenters' rights valuations but cautioning that "to the extent that the asset approach cannot yield a going concern value, we agree with the Court of Appeals that it should be given no weight"). Here, the value of Kassel Enterprises' assets depends largely on the appraisal of the farmland, which included considerations of income and market values. But if we agreed with these courts, we would also have to require the parties to use a different methodology altogether—one that would have produced a lower valuation. Given the parties' agreement that the net-asset valuation is the proper methodology, we need not address the concerns raised by these cases.

that the entity would be liquidated. Thus, all hypothetical entity-level adjustments, including any consequences associated with selling the assets, must be included in the valuation. *See Sec. State Bank*, 554 N.W.2d at 891–92.

The parties disputed two components of the net asset valuation: the amount of transaction costs associated with a hypothetical sale of the farmland and whether a capital gains tax deduction should be considered in valuing the shareholders' interest in the entity. Critically, both the transaction costs and the capital gains taxes stemmed from the hypothetical sale of the exact same asset—the farmland.

As the majority notes, the tax consequences of capital gains are borne by the entity for a C corporation but are generally passed through to the shareholders for an S corporation. It is this distinction between entity-level and shareholder-level treatment that determines whether the capital gains taxes should be taken into account in valuing a dissenting shareholder's interest using the net asset valuation method. In that respect, the capital gains taxes are no different than the transaction costs associated with a hypothetical sale of the assets—costs the majority agrees should have been considered in the valuation. If Kassel Enterprises had been a C corporation, or if it still had built-in gains to recognize at the entity level, those entity-level tax consequences should be considered as part of a hypothetical sale, irrespective of whether an actual sale was contemplated.[2]

---

[2]As explained by the majority, an S corporation that converts from a C corporation may be subject to entity-level built-in capital gains taxes based on the value of its capital property at the time of the conversion. *See* I.R.C. § 1374(d)(8). But if it holds the capital property beyond the recognition period, as Kassel Enterprises did here, the S corporation is not subject to tax on the built-in gain. *Id.* at § 1374(d)(3), (8). Thus, one example where an imminent sale could make a difference at the entity level might be an S corporation that is still in the recognition period for built-in gains at the time of the valuation. But Kassel is past that period here. In any event, there is no basis for the

But rather than stop there, the majority makes the mistake of then considering whether a sale was actually contemplated as part of determining whether the capital gains tax should be considered. Whether a sale is contemplated is simply irrelevant in a net asset valuation since the valuation is necessarily premised on a hypothetical sale. *See Daniels v. Holtz*, 794 N.W.2d 813, 819 (Iowa 2010) ("Discounting capital gains tax liability is an accepted part of an asset-based methodology for valuation and has been approved by numerous federal courts. Daniels's argument that it was improper to consider the tax liability because there was no evidence of an impending sale of the land does not change our conclusion.").

The determining factor is whether the consequences of a hypothetical sale would be recognized at the entity level, not whether a sale is contemplated or imminent, as discussed by the majority. The majority's error is seen most plainly where it agrees with the experts that transaction costs for a hypothetical sale should have been deducted but then applies a different analysis to the capital gains taxes. The experts agreed some amount of transaction costs associated with a hypothetical sale should be deducted, disagreeing only as to the amount. With respect to capital gains taxes from the hypothetical sale, the experts' disagreement turned on Kassel Enterprises' status as an S corporation, not whether a sale was contemplated. In fact they both agreed capital gains would properly be deducted if Kassel Enterprises had been a C corporation, but as the plaintiffs' expert explained, "To assume a liquidation tax discount *at the corporate level* for the sale of these assets would not be warranted for an S Corporation." (Emphasis added.) If the majority agrees with the

---

majority to address whether Craig might realize capital gains at the *shareholder* level based on a contemplated sale.

experts that hypothetical liquidation transaction costs should be deducted because those are entity-level deductions under a net asset valuation, it should have applied that same analysis to the capital gains issue and affirmed on the basis that any capital gains taxes would not be at the entity level, stopping its analysis of the capital gains issue at page 11.

McDonald, J., joins this concurrence.